1  Anne Chapman (State Bar No. 025969)
2  MITCHELL, STEIN, CAREY, CHAPMAN, PC
   One Renaissance Square
3  2 North Central Avenue, Suite 1450
   Phoenix, AZ  85004
4  anne@mscclaw.com
   Telephone:  (602) 388-1232
5
6  Jonathan D. Hacker (*pro hac vice*)
   Ephraim McDowell (*pro hac vice*)
7  O'MELVENY & MYERS LLP
   1625 Eye Street NW
8  Washington, DC 20006
   jhacker@omm.com
9  emcdowell@omm.com
   Telephone:  (202) 383-5300
10
   Attorneys for Defendants
11
12              **UNITED STATES DISTRICT COURT**

13              **DISTRICT OF ARIZONA**

14  United States of America,               Case No. 4:19-CR-00693-RM

15              *Plaintiff*,                 **DEFENDANTS' OPENING
                                             MEMORANDUM IN SUPPORT OF
16         v.                                REVERSAL OF MAGISTRATE
                                             JUDGE'S JUDGMENT OF
17  Natalie Renee Hoffman, Oona Meagan       CONVICTION**
    Holcomb, Madeline Abbe Huse,
18  Zaachila I. Orozco-McCormick,            **ORAL ARGUMENT REQUESTED**

19              *Defendants*.

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

STATEMENT OF ISSUES ................................................................. 1

INTRODUCTION ............................................................................ 1

STATEMENT OF THE CASE ......................................................... 3

      A.   Cabeza Prieta Refuge ......................................................... 3

      B.   No More Deaths ................................................................. 4

      C.   Refuge Access Permits ....................................................... 5

      D.   The Defendants' Convictions ............................................. 6

ARGUMENT .................................................................................. 7

  I.    DEFENDANTS' CONVICTIONS VIOLATE RFRA ............... 7

      A.   The Government's Prosecution Substantially Burdened Defendants' Religious Exercise ........................................ 8

          1.   The Defendants' Beliefs Are Religious In Nature ................. 8

          2.   The Defendants' Beliefs Are Sincerely Held ...................... 11

          3.   The Government's Prosecution Substantially Burdened Defendants' Religious Exercise ............................ 11

      B.   Prosecuting the Defendants Is Not the Least Restrictive Means of Furthering a Compelling Governmental Interest ........................ 13

          1.   These Prosecutions Do Not Further Any Compelling Interest .................................................. 14

          2.   These Prosecutions Are Not the Least Restrictive Means of Furthering a Compelling Interest ......................... 15

  II.    THE GOVERNMENT SELECTIVELY ENFORCED THE LAW AGAINST THE DEFENDANTS, IN VIOLATION OF THE FIFTH AMENDMENT ............................................................ 17

      A.   The Defendants' Convictions Should Be Reversed Because They Have Proved Selective Enforcement ........................ 17

      B.   At a Minimum, the Case Should Be Remanded For Discovery ...... 21

  III.   DEFENDANTS WERE ENTRAPPED BY ESTOPPEL, IN VIOLATION OF THE DUE PROCESS CLAUSE ................... 22

  IV.   DEFENDANTS' CONVICTIONS ON COUNTS II AND III VIOLATE THE ADMINISTRATIVE PROCEDURE ACT ...... 24

CONCLUSION ............................................................................. 27

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Buckley v. Valeo*,
424 U.S. 1 (1976) ............................................................................................ 21

*Burwell v. Hobby Lobby Stores*,
573 U.S. 682 (2014) .................................................................................. passim

*Employment Division v. Smith*,
494 U.S. 872 (1990) ........................................................................................ 10

*Gonzalez v. O Centro Espirita Beneficente*,
546 U.S. 418 (2006) .................................................................................. passim

*Hemp Indus. Ass'n v. DEA*,
333 F.3d 1082 (9th Cir. 2003) ........................................................................ 29

*Hobby Lobby*,
134 S. Ct. ......................................................................................................... 13

*Hoctor v. U.S. Dept. of Agric.*,
82 F.3d 165 (7th Cir. 1996) ............................................................................ 28

*Holt v. Hobbs*,
135 S. Ct. 853 (2015) ................................................................. 13, 14, 16, 17

*Lacey v. Maricopa Cty.*,
693 F.3d 896 (9th Cir. 2012) ............................................................. 19, 20, 22

*Lozman v. City of Riviera Beach*,
138 S. Ct. 1945 (2018) ................................................................................... 24

*Marx v. Gen Rev. Corp.*,
568 U.S. 371 (2013) ........................................................................................ 27

*McAllen Grace Brethren Church v. Salazar*,
764 F.3d 465 (5th Cir. 2014) .......................................................................... 18

*Moussazadeh v. Tex. Dept. of Justice*,
703 F.3d 781 (5th Cir. 2012) .......................................................................... 12

*Nat. Res. Def. Council v. Evans*,
316 F.3d 904 (9th Cir. 2003) .......................................................................... 28

*Nat'l Mining Ass'n v. McCarthy*,
758 F.3d 243 (D.C. Cir. 2014) ........................................................................ 30

*Navajo Nation v. Forest Service*,
535 F.3d 1058 (9th Cir. 2008) ................................................................. 13, 15

*Paulsen v. Daniels*,
413 F.3d 999 (9th Cir. 2005) .......................................................................... 28

*Rapanos v. United States*,
547 U.S. 715 (2006) ........................................................................................ 31

*Romer v. Evans*,
517 U.S. 620 (1996) ........................................................................................ 17

*Sherbert v. Verner*,
374 U.S. 398 (1963) ........................................................................................ 14

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Snoqualmie Indian Tribe v. FERC*,
  545 F.3d 1207 (9th Cir. 2008) ................................................................ 14

*United States v. Ballard*,
  322 U.S. 78 (1944) ................................................................................... 12

*United States v. Batterjee*,
  361 F.3d 1210 (9th Cir. 2004) ......................................................... 26, 27

*United States v. Cain*,
  583 F.3d 408 (6th Cir. 2009) ........................................................... 30, 31

*United States v. Christie*,
  825 F.3d 1048 (9th Cir. 2016) ...................................... 9, 15, 16, 17

*United States v. Davis*,
  793 F.3d 712 (7th Cir. 2015) ................................................................. 20

*United States v. Harrington*,
  749 F.3d 825 (9th Cir. 2014) ................................................................. 28

*United States v. Hinkson*,
  585 F.3d 1247 (9th Cir. 2009) .............................................................. 24

*United States v. Howard*,
  381 F.3d 873 (9th Cir. 2004) ................................................................. 22

*United States v. Juvenile Male*,
  564 U.S. 932 (2011) ................................................................................ 30

*United States v. Lewis*,
  517 F.3d 20 (1st Cir. 2008) .................................................................... 21

*United States v. Mumphrey*,
  193 F. Supp. 3d 1040 (N.D. Cal. 2016) ............................................... 22

*United States v. Picciotto*,
  875 F.3d 345 (D.C. Cir. 1989) .............................................................. 30

*United States v. Reynolds*,
  710 F.3d 498 (3d Cir. 2013) ................................................................... 30

*United States v. Seeger*,
  380 U.S. 163 (1965) .................................................................................. 9

*United States v. Sellers*,
  906 F.3d 848 (9th Cir. 2018) ....................................................... 19, 24, 25

*United States v. Steele*,
  461 F.2d 1148 (9th Cir. 1972) ................................................. 19, 20, 22, 24

*United States v. Strauss*,
  No. 05-1499 (N.D. Ariz. 2006) ............................................................... 5

*United States v. Tallmadge*,
  829 F.2d 767 (9th Cir. 1987) ......................................................... 26, 27

*United States v. Turner*,
  104 F.3d 1180 (9th Cir. 1997) .............................................................. 21

- iii -

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*United States v. Valverde,*
  628 F.3d 1159 (9th Cir. 2010) ................................................................ 28, 31

*United States v. Vasquez-Ramos,*
  531 F.3d 987 (9th Cir. 2008) ......................................................................... 9

*United States v. Ward,*
  989 F.2d 1015 (9th Cir. 1992) ....................................................... 9, 10, 11, 12

*United States v. Warren,*
  No. 17-mj-00341, Doc. 95, Exh. 10 (Mar. 21, 2019) ............................ 22, 23

*United States v. Zimmerman,*
  514 F.3d 851 (9th Cir. 2007) ................................................................. 10, 15

*W.C. v. Bowen,*
  807 F.2d 1502 (9th Cir. 1987) ................................................................ 29, 31

*Warsoldier v. Woodford,*
  418 F.3d 989 (9th Cir. 2005) ....................................................................... 13

*Yellowbear v. Lampert,*
  741 F.3d 48 (10th Cir. 2014) ................................................................. passim

*Yick Wo v. Hopkins,*
  118 U.S. 356 (1886) ..................................................................................... 24

**Statutes**

42 U.S.C. § 2000bb-1 ...................................................................................... 15

42 U.S.C. § 2000bb-1(a) ................................................................................... 8

42 U.S.C. § 2000bb-1(b) ................................................................................... 8

42 U.S.C. § 2000bb-1(c) ................................................................................... 8

42 U.S.C. § 2000cc-3(g) .................................................................................... 9

42 U.S.C. § 2000cc-5(7)(A) .............................................................................. 9

5 U.S.C. § 552(a)(D) ....................................................................................... 28

5 U.S.C. § 553 ................................................................................................. 28

**Other Authorities**

Fernanda Santos, "Border Patrol Raids Humanitarian Aid Group Camp in
  Arizona," *The New York Times* (June 16, 2017),
  www.nytimes.com/2017/06/16/us/border-patrol-immigration-no-more-
  deaths.html ................................................................................................ 23

FWS Permit Application at 2 (Doc. 70-1) ................................................. passim

http://forms.nomoredeaths.org/about-no-more-deaths/ ....................................... 4

Tom Dart, "'Shameful' Raid on Aid Camp at U.S.-Mexico Border Puts
  Lives at Risk, Volunteers Say," *The Guardian* (June 16, 2017),
  www.theguardian.com/us-news/2017/jun/16/us-mexico-border-aid-
  camp-raid ................................................................................................... 23

www.fws.gov/refuge/Cabeza_Prieta/wildlife_and_habitat/index.html .............. 3

**TABLE OF AUTHORITIES**
(continued)

Page(s)

**Rules**

Local R. Crim. P. 58.2 ..................................................................................................... 8

**STATEMENT OF ISSUES**

1.    Whether the Religious Freedom Restoration Act requires that the defendants' convictions be reversed, where the government has prosecuted them for engaging in religious exercise and has not shown that the prosecutions were the least restrictive means of furthering a compelling interest.

2.    Whether the Due Process Clause requires that the defendants' convictions be reversed (or at a minimum remanded for discovery), where the government has only referred members of the defendants' organization—and no one else—for prosecution based on relevant administrative violations.

3.    Whether the Due Process Clause requires that the defendants' convictions be reversed, where the government misrepresented that volunteers providing humanitarian aid in the desert could not and would not be prosecuted and the defendants reasonably relied on those misrepresentations.

4.    Whether the Administrative Procedure Act requires that the defendants' convictions on Counts II and III be reversed, where the government prosecuted the defendants based on a procedurally invalid substantive rule.

**INTRODUCTION**

The four defendants in this case are volunteers for a faith-based, humanitarian-aid organization called No More Deaths. An official ministry of the Unitarian Universalist Church, the organization's primary mission is to prevent suffering and death along the U.S.-Mexico border. To that end, No More Deaths volunteers hike desert trails and leave water and food in locations where deaths have recently been documented. The Cabeza Prieta Wildlife Refuge, which occupies a 1,343-square-mile area in southwestern Arizona, is one of the primary locations where No More Deaths volunteers provide aid. The unforgiving refuge, with temperatures regularly exceeding 100 degrees, has seen hundreds of deaths in recent years.

On August 13, 2017, the defendants set out to provide humanitarian aid on the refuge. They did not have permits to enter the refuge because of a recent change to the

1   entry-permit applications: The new application, unlike the previous one, required entrants
2   to vow that they would not leave water or food on the refuge. The defendants could not
3   make such a promise, so did not obtain permits. While the defendants were providing aid
4   on the refuge, a U.S. Fish & Wildlife Service (FWS) officer stopped them and asked them
5   to leave. They immediately did so. Even though the officer did not issue a citation, he
6   later referred the defendants to the U.S. Attorney's Office for criminal prosecution. That
7   Office carried out the prosecution, and a magistrate judge convicted the defendants after a
8   three-day bench trial. The judge then sentenced each of the defendants to 15 months'
9   probation and a $250 fine.

10      For four independent reasons, the defendants' convictions are fundamentally
11   defective and must be reversed.

12      *First*, the convictions violate the Religious Freedom Restoration Act (RFRA). The
13   defendants all testified that their religious and spiritual beliefs compel them to volunteer
14   for No More Deaths by providing aid to those who are suffering. Yet they have been
15   convicted for engaging in that very activity—plainly a "substantial burden" on their
16   religious exercise. In such a circumstance, RFRA requires the government to show that its
17   prosecution is the least restrictive means of furthering a compelling interest. It has not
18   come close to doing so.

19      *Second*, the convictions violate the defendants' equal protection rights. The Due
20   Process Clause's equal protection component prevents the federal government from
21   selectively enforcing its laws against those who exercise their constitutional right of
22   associating with a particular group. Despite having been denied discovery, the defendants
23   presented substantial evidence at trial showing that FWS referred their case for
24   prosecution because of its hostility toward No More Deaths. And they presented further
25   evidence showing that FWS had *not* referred similar cases for prosecution where the
26   offenders did not belong to No More Deaths. Such evidence of discriminatory purpose
27   and effect establishes a constitutional violation; and at the very least, it warrants a remand
28   for discovery on this issue.

*Third*, the convictions violate the defendants' due process rights. The Due Process Clause forbids the government from misleading a defendant into violating the law. One month before the incident in this case, an Assistant U.S. Attorney assured No More Deaths leaders that his Office was uninterested in prosecuting volunteers who were providing humanitarian aid. On top of that, FWS' permit application precludes criminal penalties for those who leave food or water on the refuge. The defendants reasonably relied on these representations when they entered the refuge to provide aid and thus cannot be convicted for doing so.

*Fourth*, the convictions violate the Administrative Procedure Act (APA). That Act requires federal agencies to promulgate substantive rules through public notice and comment. FWS' amendment of the refuge permit application is a substantive rule, because it fundamentally altered the preexisting regulatory regime in a manner that affected individual rights. Yet FWS did not subject the rule to notice and comment, thereby flouting its APA obligations. The rule is accordingly void, and the defendants' convictions—which are premised on that rule—cannot stand.

## STATEMENT OF THE CASE

### A.   Cabeza Prieta Refuge

Located in southwestern Arizona, the Cabeza Prieta National Wildlife Refuge spans 1,343 square miles and shares a 56-mile border with Sonora, Mexico. *See* Tr. 1:123.[1] FWS, the federal agency tasked with managing the refuge, describes the 56-mile border as "the loneliest international boundary on the continent."[2] The refuge's remoteness is matched by its extreme conditions. Summer temperatures routinely exceed 100 degrees, and the area lacks any source of safe drinking water. Tr. 1:87; 1:180; 3:150. FWS calls the refuge "one of the most extreme environments in North America," with a "rugged landscape, high temperatures, . . . and other threats such as venomous reptiles." FWS Acknowledgment of Danger and Release, Permit Application ("Permit

---

[1] Citations to the trial transcript are in the following format: Trial Day: Page Number.
[2] www.fws.gov/refuge/Cabeza_Prieta/wildlife_and_habitat/index.html.

Application") at 2 (Doc. 70, Ex. C at 2).[3] As a result, FWS urges refuge entrants "to pack sufficient water, food, and first aid supplies . . . at all times," cautioning that "emergency services are not guaranteed." *Id.*

The refuge's extreme conditions have led to countless deaths over the last two decades. The Pima County Examiner's Office reports that 249 dead bodies were found on the refuge between 2000 and 2017, and 48 were found in 2017 alone. Tr. 1:177. These figures do not begin to capture the total number of people who have succumbed to the refuge during these periods: untold numbers of bodies have surely gone unrecovered. Tr. 1:167; 2:79.

**B.    No More Deaths**

In 2004, various religious leaders in Tucson, Arizona formed a faith-based, humanitarian-aid organization called No More Deaths. Tr. 1:199; 1:201. The organization is an official ministry of the Unitarian Universalist Church of Tucson, Tr. 1:201, and its mission is to "end death and suffering in the Mexico-U.S. borderlands."[4] To that end, No More Deaths volunteers hike desert trails and "leave water, food, socks, blankets and other supplies" for anyone who may need them. *Id.* The volunteers meticulously map out their supply drops, seeking to provide aid in the areas where human remains have most recently been documented. Tr. 2:85-87; 2:149-50; 2:155-157. During their hikes, the volunteers carry bags to remove trash and debris that has been deposited on the refuge—including food cans and water bottles previously left by No More Deaths volunteers—adhering to the principle of "taking out more than they leave." Tr. 2:171; 3:21. All the while, No More Deaths volunteers "practice [their] faith out there in the desert" by helping those who are "in most need." Tr. 1:202-03 (testimony of No More Deaths founding member John Fife, a Christian Minister).

Throughout its history, No More Deaths has worked cooperatively with the federal government—including the Department of Justice (DOJ) and FWS—to ensure that it

---

[3] Except as otherwise noted, docket entries referenced herein are from the underlying docket of *United States v. Hoffman*, No. 4:17-mj-00339-BPV (D. Ariz.).
[4] http://forms.nomoredeaths.org/about-no-more-deaths/.

carries out its work lawfully. *See United States v. Strauss*, No. 4:05-cr-1499, slip op. at 2 (N.D. Ariz. Sept. 1, 2006) (noting that No More Deaths leaders consistently met with government officials to determine how "to provide humanitarian aid in a manner which would not violate the law") (Doc. 70, Ex. D). In July 2017, No More Deaths leaders met with DOJ and FWS officials to discuss the organization's activities. Tr. 2:65. At that meeting, an Assistant U.S. Attorney from the District of Arizona stated that his office had no interest in criminally prosecuting individuals who were providing aid in the desert. Tr. 2:66-67. In light of these representations, No More Deaths leaders informed volunteers that they would not face criminal charges for providing such aid. Tr. 2:160-62; 2:191; 3:23; 3:64; 3:90; 3:109.

## C.      Refuge Access Permits

FWS requires members of the public to obtain permits before accessing or using a vehicle on the Cabeza Prieta Wildlife Refuge. *See* FWS Permit Application (Doc. 70, Ex. C). In accordance with that requirement, No More Deaths volunteers had consistently obtained permits before entering the refuge to provide humanitarian aid. Tr. 2:31; 3:61 (defendant Hoffman stating that she obtained a permit in 2015). In July 2017, however, FWS amended the permit application—without providing any notice or opportunity to comment—by adding a new "Paragraph 13." Tr. 1:74; 2:43-44; 2:46; *see* FWS Permit Application at 2 (Doc. 70, Ex. C at 2). Prior iterations of the permit application did not include this paragraph. Doc. 99, at 4 (government conceding this point); *see* Tr. 2:31; 2:43-44; 2:46. The new Paragraph 13 requires applicants to agree not to "abandon personal property or possessions" on the refuge, and defines "personal property and possessions" to include "water bottles, water containers, food, food items, food containers, blankets, clothing, footwear, [and] medical supplies." FWS Permit Application at 2 (Doc. 70, Ex. C at 2). According to the application, those who violate Paragraph 13 "may be subject to judicial penalties to include fines, civil action, and/or debarment." *Id.* The application does not mention the possibility of criminal penalties for Paragraph 13 violations, though it refers to criminal penalties for other permit violations. *See id.*

### D.     The Defendants' Convictions

The defendants in this case are Natalie Renee Hoffman, age 23, Oona Meagan Holcomb, age 39, Madeline Abbe Huse, age 23, and Zaachila I. Orozco-McCormick, age 21. Tr. 2:145; 3:11; 3:51-52; 3:83. All four defendants volunteer for No More Deaths. Tr. 2:146; 3:15; 3:53; 3:84. All four feel compelled to do so because of the religious and spiritual beliefs they hold. Tr. 2:147; 3:14-15; 3:54; 3:95-96.

On August 13, 2017, the defendants set out to leave water and food on the Cabeza Prieta refuge. Tr. 3:25. The temperature was 110 degrees. Tr. 1:89.  As planned, Hoffman drove a pick-up truck—registered to the Unitarian Universalist Church of Tucson, Tr. 1:82—to specified points on the refuge where the defendants would leave water and food. Tr. 3:67-68. The defendants chose the drop points based on data showing where human remains had most recently been found. Tr. 2:150 (Holcomb testifying that "remains [were] being found on a daily basis" in the area where they provided aid). To reach those points, Hoffman drove the truck only on established roads. Tr. 2:168-170.

FWS Officer Michael West received photographs from a camera positioned on the refuge showing the defendants' activities. Tr. 1:18-19. He then drove a truck to the spot where the defendants had stopped to leave water and food and began questioning them. Tr. 1:32; 1:46. The defendants admitted that they lacked refuge access permits, but explained that they were there only to provide humanitarian aid. Tr. 1:49; 1:51. After West asked them to leave the refuge, they did so.  Tr. 1:52. West did not issue a citation or arrest the defendants. Tr. 1:82. Nonetheless, he decided to refer the defendants to the U.S. Attorney's Office for prosecution. Tr. 1:84.

On December 6, 2017, the U.S. Attorney's Office issued a criminal information charging the defendants with Class B Misdemeanors. Doc. 1. Count I charged Hoffman with using a motor vehicle in a designated wilderness area without lawful authority, in violation of 50 C.F.R. § 35.5. *Id.* Count II charged all four defendants with entering a national wildlife refuge without a permit, in violation of 50 C.F.R. § 26.22(b). *Id.* And Count III charged all four defendants with abandoning personal property on a national

wildlife refuge, in violation of 50 C.F.R. § 27.93. *Id.* The defendants' case was referred to a magistrate judge.

The defendants moved to compel discovery from the government relevant to defenses based on RFRA, selective enforcement, entrapment by estoppel, and the APA. *See* Doc. 43 (motion to compel); *see also* Docs. 70, 82, 83, 84 (renewed motions to compel as to each defense). The magistrate judge denied discovery on each of these defenses. Doc. 68 (order denying motion to compel); Doc. 136 (order denying renewed motions to compel). The defendants next moved to dismiss their indictments based on these defenses. *See* Docs. 70, 82, 83, 84. The magistrate judge denied all of the motions, but allowed the defendants to reassert their RFRA and entrapment by estoppel defenses at trial. *See* Doc. 136, at 11-12.

After a three-day bench trial, the judge issued a three-page order convicting the defendants on all counts and denying all pending motions. Doc. 166. The judge began by noting FWS' role in preserving the refuge, an area he stressed was "littered with . . . the detritus of illegal entry into the United States." *Id.* at 1. The judge then described the defendants' case as "a modified *Antigone* defense, in that they are acting in accordance with a higher law." *Id.* at 2. Finally, he concluded, without explanation, that "[t]he Defendants have failed to establish the facts necessary to support their asserted affirmative defenses." *Id.*

The defendants filed a motion for a new trial, Doc. 173, which the magistrate judge denied without a written ruling, Doc. 182 (minute entry). He then sentenced all four defendants to 15 months' probation for each count (to run concurrently), as well as a $250 fine. Docs. 183-86. In so doing, the judge made clear that "in a broad[] sense," he believed the defendants were "aiding and abetting illegal entry." Doc. 193, at 18. The defendants timely appealed. *See* No. 19-CR-00693, Doc. 1; Local R. Crim. P. 58.2.

## **ARGUMENT**

## I. **DEFENDANTS' CONVICTIONS VIOLATE RFRA**

"Congress enacted RFRA in 1993 in order to provide very broad protection for

religious liberty." *Burwell v. Hobby Lobby Stores*, 573 U.S. 682, 693 (2014). RFRA prohibits the federal government from substantially burdening a person's religious exercise, "even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a). "The only exception" to this prohibition is if "the Government demonstrates that application of the burden to the person represents the least restrictive means of advancing a compelling interest." *Gonzalez v. O Centro Espirita Beneficente*, 546 U.S. 418, 423-24 (2006); 42 U.S.C. § 2000bb-1(b). "A person whose religious practices are burdened in violation of RFRA 'may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief.'" *O Centro*, 546 U.S. at 424 (quoting 42 U.S.C. § 2000bb-1(c)). Accordingly, a defendant who is indicted and/or convicted "for engaging in activities that form a part of his religious exercise but are prohibited by law" may "raise RFRA as a shield in the hopes of beating back the government's charge." *United States v. Christie*, 825 F.3d 1048, 1055 (9th Cir. 2016). This Court reviews the magistrate judge's denial of RFRA relief de novo. *See United States v. Vasquez-Ramos*, 531 F.3d 987, 990 (9th Cir. 2008).

### A.   The Government's Prosecution Substantially Burdened Defendants' Religious Exercise

To succeed on their RFRA defense, the defendants bear the initial burden of proving that (1) "the beliefs they espouse are actually religious in nature"; (2) "they sincerely hold those beliefs"; and (3) prosecuting them "impose[d] a substantial burden on their ability to conduct themselves in accordance with those sincerely held religious beliefs." *Christie*, 825 F.3d at 1056.

### 1.   The Defendants' Beliefs Are Religious In Nature

RFRA protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief" and mandates that its provisions "be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc-5(7)(A), 3(g). "In determining whether [a defendant's] own peculiar notions are protected as religious beliefs, the task is

to decide whether the beliefs professed are . . ., in [the defendant's] own scheme of things, religious." *United States v. Ward*, 989 F.2d 1015, 1018 (9th Cir. 1992) (quotation marks omitted). Given this "intensely personal area," an individual's claim that her belief "is an essential part of a religious faith must be given great weight." *United States v. Seeger*, 380 U.S. 163, 184 (1965). "[I]t is not for [courts] to say that [one's] religious beliefs are mistaken or insubstantial." *Hobby Lobby*, 573 U.S. at 725. "[F]ederal judges," after all, "are hardly fit arbiters of the world's religions." *Yellowbear v. Lampert*, 741 F.3d 48, 54 (10th Cir. 2014).

Religious beliefs are "those that stem from a person's moral, ethical, or religious beliefs about what is right and wrong and are held with the strength of traditional religious convictions." *Ward*, 989 F.2d at 1018. Such beliefs need not be "central to a mainstream religion." *United States v. Zimmerman*, 514 F.3d 851, 853 (9th Cir. 2007). In *Ward*, the Ninth Circuit applied these principles to a defendant who professed a belief that "honesty is superior to truth" and thus objected to taking the standard oath when testifying at his own trial ("Do you affirm to speak with truth?"), instead requesting that the word "truth" be replaced with "honesty." 989 F.2d at 1017. The Ninth Circuit concluded that the defendant's belief was religious in nature: Although the defendant did "not describe his beliefs in terms ordinarily used in discussions of theology or cosmology," the court reasoned, he "clearly attempt[ed] to express a moral or ethical sense of right and wrong." *Id.* at 1018. Because the defendant was nonetheless compelled to take the standard oath rather than his modified version, the court reversed the defendant's conviction. *Id.* at 1020.[5]

The defendants here hold the "moral, ethical, [and] religious belief[]," *id.* at 1018, that they must provide humanitarian aid to prevent the death and suffering occurring along the U.S.-Mexico border. Hoffman testified at trial that she "believe[s] that all life is sacred"; that she "feel[s] spiritually connected to [her] work" for No More Deaths; and

---

[5] Although *Ward* applied the Free Exercise Clause, RFRA "provide[s] even broader protection for religious liberty than" that Clause, even as interpreted before *Employment Division v. Smith*, 494 U.S. 872 (1990). *Hobby Lobby*, 573 U.S. at 695 n.3.

that she "fe[els] compelled" by her beliefs to volunteer for No More Deaths. Tr. 3:53-55. Holcomb testified that she "fe[els] compelled" by her religious beliefs to work for No More Deaths and described "a deep spiritual need and a calling to do [this] work." Tr. 2:147; 2:149. Huse testified that she believes "[l]ife is sacred" and that she feels "obligated to be there [in the desert] and do [her] part." Tr. 3:96. And Orozco-McCormick testified that her belief "in the sanctity of life" drives her to volunteer for No More Deaths and described the experience of providing aid as "sacred." Tr. 3:14; 3:19.

The defendants hold these beliefs with "the strength of traditional religious convictions." *Ward*, 989 F.2d at 1018. That is clear from the sacrifices they have made to volunteer for No More Deaths, including moving across the country. *See* Tr. 3:54 (Hoffman moved from Virginia to Arizona). And it is clear from their willingness to accept the health risks and endure the discomfort of hiking in the 110-degree desert heat to provide aid. Tr. 3:96 ("Hiking in 110 degrees is not what I want to be doing with my time, but I do it because I feel the need to.").

The organization for which the defendants volunteer, No More Deaths, is also distinctly religious. It was formed by religious leaders, in part on the principle that the New Testament required them to help those who are "in most need." Tr. 1:199-203. It is an official ministry of the Unitarian Universalist Church of Tucson. Tr. 1:201. And its trainings for volunteers teach principles of faith and spirituality. Tr. 1:204.

In denying the defendants' motions to compel and dismiss, the magistrate judge suggested that the defendants' beliefs are political, rather than spiritual, because they align with liberal ideology about immigration. *See* Doc. 68, at 5; Doc. 136, at 10-11. But the same argument could have been made in *Hobby Lobby*, where the RFRA claimants' beliefs about contraceptives tracked beliefs espoused by political conservatives, and yet the Court had no trouble concluding that those beliefs were religious. 573 U.S at 700-04, 720. More fundamentally, if the defendants' beliefs in fact stemmed from politics, they would picket, send letters to representatives, or mobilize voters. Because their beliefs are "moral, ethical, [and] religious," however, *see Ward*, 989 F.2d at 1018, they joined a

religious organization focused on providing direct aid to those in need.

### 2.    The Defendants' Beliefs Are Sincerely Held

In evaluating the sincerity of the defendants' religious beliefs, the Court's "narrow function" is determining whether those beliefs "reflect[] an honest conviction," *Hobby Lobby*, 573 U.S. at 725, or instead represent an effort "to perpetrate a fraud on the court," *Yellowbear*, 741 F.3d at 54. The "sincerity inquiry" is thus limited "to almost exclusively a credibility assessment" and "must be handled with a light touch, or judicial shyness." *Moussazadeh v. Tex. Dep't of Justice*, 703 F.3d 781, 792 (5th Cir. 2012) (quotation marks omitted). This deferential approach flows from the fact that people "may believe what they cannot prove," and therefore "may not be put to the proof of their religious doctrines or beliefs." *United States v. Ballard*, 322 U.S. 78, 86 (1944).

Here, there is no genuine question that the defendants sincerely hold the religious beliefs to which they testified under oath at trial. *See supra* at 9-10. The government has not and cannot show that the defendants' testimony lacked "credibility" or amounted to "a fraud on the court," which it would have to do to challenge the defendants' sincerity. *Moussazadeh*, 703 F.3d at 792; *Yellowbear*, 741 F.3d at 54. If there were any doubt, the defendants' "actions are evidence of" the "sincerity of [their] true religious conviction," *Ward*, 989 F.2d at 1018: absent a sincerely held belief in the necessity of providing aid to those suffering in the desert, there is no reason why the defendants would uproot their lives and routinely hike in 110-degree heat to do so.

### 3.    The Government's Prosecution Substantially Burdened Defendants' Religious Exercise

The government substantially burdens a person's religious exercise when it "coerce[s] [the person] to act contrary to [her] religious beliefs by the threat of civil or criminal sanctions." *Navajo Nation v. Forest Serv.*, 535 F.3d 1058, 1070 (9th Cir. 2008) (en banc). Courts, including the Supreme Court and Ninth Circuit, have held that a RFRA claimant "easily" proves a substantial burden when she shows that she will face "serious disciplinary action" for practicing her religious beliefs. *Holt v. Hobbs*, 135 S. Ct. 853, 862

(2015); *see Warsoldier v. Woodford*, 418 F.3d 989, 996 (9th Cir. 2005); *Yellowbear*, 741 F.3d at 56.

The defendants' religious beliefs drive them to enter the Cabeza Prieta Refuge and use a vehicle to provide water, food, and medical supplies. *See Hobby Lobby*, 573 U.S. at 710 ("[T]he 'exercise of religion' involves not only belief and profession but the performance of . . . physical acts that are engaged in for religious reasons." (quotation omitted)). Scores of deaths have occurred on the refuge, and the refuge is too expansive and treacherous to traverse without a vehicle. Tr. 2:7-8; 2:80; 3:45. The government prohibits the defendants from entering the refuge without a permit, but the defendants cannot obtain a permit unless they aver that they will not leave behind water, food, and medical supplies. *See supra* at 5. This regime thus creates an impossible set of choices for the defendants: (1) obtain a permit but violate the permit's terms and face criminal prosecution; (2) do not obtain a permit but violate the permit requirement and face criminal prosecution; or (3) forgo the exercise of religious beliefs they feel compelled to pursue. That "Catch-22 situation" involving "exercise of their religion under fear of civil or criminal sanction" is the quintessential substantial burden on religion. *Snoqualmie Indian Tribe v. FERC*, 545 F.3d 1207, 1214 (9th Cir. 2008); *see Sherbert v. Verner*, 374 U.S. 398, 404 (1963) ("Governmental imposition of . . . a choice" between "following the precepts of [one's] religion" and accepting a penalty "burden[s] the free exercise of religion").

In denying the defendants' motion to compel discovery, the magistrate judge fundamentally misunderstood RFRA's "substantial burden" inquiry. He reasoned that there could be no substantial burden because the defendants "did not attempt to obtain permits for access to" the refuge. Doc. 68, at 5. But he ignored that obtaining a permit would have required the defendants to disavow the very activity (leaving food, water, and supplies) that their religious beliefs compel: the definition of a "Catch-22 situation." *Snoqualmie*, 545 F.3d at 1214. He also stressed that the Cabeza Prieta Refuge makes up only "13.4% of the total border," implying that the defendants could simply provide aid

elsewhere. Doc. 68, at 5. But that reasoning turns RFRA on its head, by forcing the religious claimant—as opposed to the government—to meet a narrow tailoring requirement. Indeed, the Supreme Court has rejected the magistrate judge's exact "alternative means" rationale as foreign to RFRA. *Holt*, 135 S. Ct. at 862. RFRA asks only "whether the government has substantially burdened religious exercise[,] . . . not whether the [RFRA] claimant is able to engage in other forms of religious exercise." *Id.*

Even further afield is the government's contention below that "the government's choice of how to use its own land" can *never* substantially burden someone's religious exercise. Doc. 97, at 9. Under this radical view, the government could seize a religious group's sacred land through eminent domain—thereby making the land its own—and then exclude that group from the land under threat of criminal sanction in perpetuity. Surely a statute Congress enacted for the sole purpose of "provid[ing] very broad protection for religious liberty" cannot not tolerate such government action. *Hobby Lobby*, 573 U.S. 693. Unsurprisingly, the government cited no case supporting its position. It instead relied on *Navajo Nation*, which never suggests that RFRA does not apply "to the government's use and management of its land"; in fact, perhaps recognizing the implausibility of such an argument, the government there did not even raise it. 535 F.3d at 1067 n.9.

## B.   Prosecuting the Defendants Is Not the Least Restrictive Means of Furthering a Compelling Governmental Interest

Because the defendants have established that prosecuting them substantially burdened their religious exercise, the burden shifts to the government to "demonstrate[] that application of th[at] burden to" the defendants was the "least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000bb-1; *see O Centro*, 546 U.S. at 428. To meet its burden, the government must first show "that demanding [the defendants'] unbending compliance" would "actually advance a compelling government interest to some meaningful degree." *Christie*, 825 F.3d at 1056. "If the government clears that hurdle, it must then show that forcing the [defendants] to comply with the [relevant law] is the least restrictive means by which it can achieve its compelling interest." *Id.* The

1  government's burden is a "heavy" one, *Zimmerman*, 514 F.3d at 855, as Congress

2  borrowed RFRA's "compelling interest test" from "First Amendment cases applying

3  perhaps the strictest form of judicial scrutiny known to American law," *Yellowbear*, 741

4  F.3d at 59.

5            **1.      These Prosecutions Do Not Further Any Compelling Interest**

6          Even if the government asserts interests that are compelling "in the abstract," it

7  must show that those interests are furthered by the prosecutions in "*this case*." *Christie*,

8  825 F.3d at 1056-57 (emphasis added). Said otherwise, the government must show that its

9  "marginal interest in enforcing [these laws] in these cases" is compelling. *Hobby Lobby*,

10 573 U.S. at 727. In *O Centro*, for instance, the government applied the Controlled

11 Substances Act to a religious sect's use of a prohibited substance, relying on "the general

12 interest in promoting public health and safety." 546 U.S. at 438. Rejecting that

13 application, the Court held that RFRA requires a "more focused inquiry" based on the

14 government's marginal interest in enforcement against "the particular use at issue." *Id.*

15         The government here contends that criminal enforcement furthers an interest in

16 preserving the wildlife refuge's environmental integrity. *See* Tr. 3:151. But even if that

17 interest is compelling in the abstract, the government has failed to show that it is

18 "compelling on the facts of this case." *Christie*, 825 F.3d at 1057. Indeed, it "is hard to

19 take seriously" the notion that the refuge's environmental integrity "would be seriously

20 compromised by allowing" four individuals to leave behind food and water, while also

21 picking up and disposing of other debris they find—including food cans and water bottles

22 left previously, Tr. 2:171; 3:21; 3:88. *Holt*, 135 S. Ct. at 863. The government's principal

23 argument on this score is that permitting exceptions to these defendants would create

24 enough waste to threaten the Sonoran Pronghorn population, an endangered species

25 inhabiting the refuge. Tr. 3:139-41; 3:148. But No More Deaths volunteers have been

26 providing humanitarian aid on the refuge for over a decade, and the Sonoran Pronghorn's

27 population has *increased eleven-fold* during that period. Tr. 3:148-152; 3:152

28 (government expert agreeing that the Sonoran Pronghorn "are doing great").

As a back up, the government argues that granting exemptions for these defendants would open the floodgates to more, and too many exemptions would harm the refuge. *See* Doc. 97, at 15 ("permitting an exemption for these four defendants would quickly lead" to further exemptions). But that "slippery slope" argument merely "echoes the classic rejoinder of bureaucrats throughout history: If I make an exception for you, I'll have to make one for everybody, so no exceptions." *O Centro*, 546 U.S. at 436. The Supreme Court has rebuffed such arguments, recognizing that they "could be invoked in response to any RFRA claim for an exception to a generally applicable law." *Id.* at 435-36; *see Holt*, 135 S. Ct. at 866 (same).[6]

**2.    These Prosecutions Are Not the Least Restrictive Means of Furthering a Compelling Interest**

Even if the government could show that these prosecutions furthered a compelling interest to a meaningful degree, it could not show that they were the least restrictive means of furthering that interest. "The least-restrictive-means standard is exceptionally demanding," requiring the government to prove "that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties." *Hobby Lobby*, 573 U.S. at 728. This Court may "not ease the government's burden by rubberstamping vague or generalized arguments about means and ends." *Christie*, 825 F.3d at 1063. Rather, the government can satisfy its burden only if it "provide[s] evidence" to "substantiate" its assertions. *Hobby Lobby*, 573 U.S. at 733.

The government has not proved that it lacks other means of achieving its environmental-protection goals. For instance, the government could allow these

---

[6] At certain points in these proceedings, the government also asserted an interest in preventing illegal immigration, Tr. 3:168; Doc. 97, at 14, seemingly resting on the following chain of reasoning: these prosecutions will deter people from providing humanitarian aid on the border; without aid, more migrants will die crossing the border; as a result, fewer migrants will attempt to cross the border. But the government did not even attempt to support this attenuated (and morbid) causal chain. *See Hobby* Lobby, 573 U.S. at 732 (government cannot prevail under RFRA where it "has made no effort to substantiate [its] prediction"). Regardless, no amount of evidence could justify a government interest that entails purposefully creating a risk of death for a disfavored group. *Cf. Romer v. Evans*, 517 U.S. 620, 634 (1996) ("[The] desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest.").

defendants to leave water and food at certain designated points on the refuge, so long as they maintained their practice of removing all trash they encountered on their hikes, including and especially used water bottles and food cans formerly left by No More Deaths volunteers. *See supra* at 4. That had been the arrangement between the government and No More Deaths prior to these prosecutions, and the government has presented no evidence that the refuge's environmental integrity suffered as a result. To the contrary, the government's chief environmental concern (protecting the Sonoran Pronghorn population) has markedly *improved*. Tr. 3:148-152. This past practice shows that the government's predictions of environmental harm are "just conjecture," unsupported by "*actual* evidence" that its preferred "regulatory framework . . . is, in fact, the least restrictive means." *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 476 (5th Cir. 2014) (holding that government failed to prove that excluding religious adherents from permitting program was least restrictive means of "preserving the eagle population").

Similarly, the government could allow these defendants to use a vehicle while providing humanitarian aid, so long as they drive only on already-established roads (as the defendants did in this case, *see* Tr. 2:170). That compromise is clearly feasible, given that the government already allows numerous other vehicles on those roads. *See* Tr. 1:126; 1:131; 3:145 (law enforcement officials routinely drive on the refuge's roads); Tr. 1:126-27 (certain members of the public may drive on the refuge's roads, e.g., those surveying the land or "cataloging artifacts"). Where, as here, the government already "exempt[s] certain people from its requirements," it can hardly claim that providing exemptions to *these* defendants is untenable. *O Centro*, 546 U.S. at 432-33; *see Hobby Lobby*, 573 U.S. at 730 (by providing an exception to others, the government "itself has demonstrated that it has at its disposal an approach that is less restrictive"); *McAllen Grace Brethren Church*, 764 F.3d at 475 ("The very existence of a government-sanctioned exception to a regulatory scheme that is purported to be the least restrictive means can, in fact, demonstrate that other, less-restrictive alternatives could exist.").

Because the government cannot "refute [these] alternative schemes" suggested by the defendants, it cannot satisfy the least-restrictive-means standard. *Yellowbear*, 741 F.3d at 62 (quotation omitted). Accordingly, RFRA requires reversal of the defendants' convictions.

## II.   THE GOVERNMENT SELECTIVELY ENFORCED THE LAW AGAINST THE DEFENDANTS, IN VIOLATION OF THE FIFTH AMENDMENT

Selective enforcement of the law by federal government officials violates the equal-protection component of the Fifth Amendment's Due Process Clause. *United States v. Steele*, 461 F.2d 1148, 1151 (9th Cir. 1972). To prevail on a selective-enforcement claim, a defendant "must demonstrate that enforcement had a discriminatory effect and the [government officials] were motivated by a discriminatory purpose." *Lacey v. Maricopa Cty.*, 693 F.3d 896, 920 (9th Cir. 2012) (en banc) (quotation omitted). This Court reviews the magistrate judge's denial of the defendants' motion to dismiss their indictments based on selective enforcement de novo, and his denial of discovery on the matter for abuse of discretion. *See United States v. Sellers*, 906 F.3d 848, 851-52 (9th Cir. 2018).

### A.   The Defendants' Convictions Should Be Reversed Because They Have Proved Selective Enforcement

To establish selective enforcement, the defendants must show both discriminatory effect and purpose. Showing discriminatory effect requires evidence that the government did not enforce the relevant law against "similarly situated individuals." *Lacey*, 693 F.3d at 920. Showing discriminatory purpose requires evidence that the government "decided to enforce the law against [the defendants] on the basis of an impermissible ground such as . . . exercise of constitutional rights." *Id.* at 922 (quotation omitted). The Ninth Circuit's *Steele* decision is instructive. The defendant there, a member of a census-resistance movement, was convicted of violating a federal law requiring him to answer census questions. 461 F.2d at 1151. At trial, he presented evidence that the government had prosecuted only four people in his state for this crime, and all four had belonged to the

same movement he did. *Id.* He also showed, in contrast, that six other people in his state who had not completed the census but did not belong to the movement were *not* prosecuted. *Id.* On this evidence, the Ninth Circuit reversed the defendant's conviction, holding that he had proved "a purposeful discrimination by census authorities against those who had publicly expressed their opinions about the census." *Id.* at 1152.

Reversal is warranted for the same reasons here. Begin with discriminatory effect. At trial, despite having been denied discovery, the defendants presented evidence obtained through Freedom of Information Act (FOIA) requests showing that FWS agents referred No More Deaths volunteers for prosecution at a significantly higher rate than others who were found committing similar violations. *See United States v. Davis*, 793 F.3d 712, 721 (7th Cir. 2015) (en banc) ("deciding which suspects to refer for prosecution" is an enforcement action subject to selective-enforcement claims); Tr. 1:83-84 (FWS officer in this case stating that he referred the defendants for criminal charges). Between January 1, 2015 and June 17, 2017, on five occasions, FWS agents found non-No More Deaths individuals committing regulatory infractions on the refuge similar to the ones the defendants committed here (e.g., driving off designated roads and/or lacking permits). Tr. 2:123. FWS did not refer any of those individuals for prosecution. *Id.* But the one No More Deaths volunteer who an FWS agent found committing such a violation during that period *was* referred for prosecution. Tr. 2:122. And the trend gets worse between June 17, 2017 and August 13, 2017 (the date of the defendants' infractions). During that period, FWS agents found six non-No More Deaths individuals committing similar violations as the defendants and referred *none* for prosecution. Tr. 2:125-127. By contrast, FWS agents found nine No More Deaths volunteers committing such infractions, and referred *eight* for prosecution. Tr. 2:124; 2:127.

Confronted with this evidence, the magistrate judge stated in one sentence: "[The defendants] are unable to point to any other persons similarly acting who are not being prosecuted." Doc. 136, at 8. This statement is demonstrably wrong: as just shown, the defendants in fact pointed to numerous similarly situated people—i.e., those found to have

committed a similar type of administrative, refuge-related infraction as the defendants but who did not belong to No More Deaths—who FWS did not refer for prosecution. *See, e.g.*, *United States v. Lewis*, 517 F.3d 20, 27 (1st Cir. 2008) ("A similarly situated offender is one outside the protected class who has committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced."). Indeed, the form of "discriminatory effect" evidence the defendants presented tracks the evidence in *Steele*, which the Ninth Circuit found sufficient to reverse the defendant's conviction. *See supra* at 18.

Next, consider discriminatory purpose. The defendants have demonstrated that FWS agents disproportionately referred No More Deaths volunteers for prosecution "at least in part because of" their hostility toward the organization. *United States v. Turner*, 104 F.3d 1180, 1184 (9th Cir. 1997); *see Buckley v. Valeo*, 424 U.S. 1, 25 (1976) ("[T]he right of association is a basic constitutional freedom."); *Lacey*, 693 F.3d at 922 (finding discriminatory purpose because the government enforced the law against an organization "in retaliation for its First Amendment-protected activities"). As an initial matter, the fact that 100% of people referred for prosecution based on refuge-related administrative violations belonged to No More Deaths is itself "probative of discriminatory intent." *United States v. Mumphrey*, 193 F. Supp. 3d 1040, 1063 (N.D. Cal. 2016).

Moreover, the evidence shows that: FWS agents were keenly aware of No More Deaths volunteers' activities on the refuge, Tr. 2:42; agents were directed to specially notify supervisors when No More Deaths volunteers sought permits or provided aid on the refuge, Tr. 1:146-148; 2:30 (refuge manager sent email stating: "If somebody appears that they are part of No More Deaths group, get myself or [other supervisor]"); 2:36; 2:42; FWS placed No More Deaths volunteers—and No More Deaths volunteers alone—on "do not issue permit" lists, Tr. 2:37-38; and FWS changed its permitting criteria to prohibit provision of humanitarian aid in order to target No More Deaths, Tr. 2:46-47 (refuge manager admitting that change was "made in response to what [he] had learned No More Deaths was doing on the refuge"). Such "enforcement procedure[s]" that "focus[] on the

vocal offender" are "inherently suspect" and evince discriminatory motive. *Steele*, 461 F.2d at 1152.

Finally, leading up to the defendants' infractions, FWS officials collaborated extensively with Border Patrol officials about targeting No More Deaths volunteers. A Border Patrol agent forwarded an email to FWS about No More Deaths members being in "the Organ Pipe National Monument" and stated, "[i]f there is anything I can do, just call." *United States v. Warren*, No. 17-mj-00341, Doc. 100, Ex. 22 at 2 (D. Ariz. Mar. 21, 2019); *see United States v. Howard*, 381 F.3d 873, 876 n.1 (9th Cir. 2004) (taking "judicial notice of . . . facts" from court records in another case). And two FWS officials had ongoing texting relationships with a Border Patrol official that revealed clear hostility toward No More Deaths volunteers. *See* Doc. 83, at 9 (FWS official saying "Love it" about the arrest of a No More Deaths volunteer); *id.* (Border Patrol official asking FWS official to "Let [him] know [i]f anymore bean droppers come around").

FWS' motive for selectively enforcing the law against No More Deaths volunteers is not difficult to discern: No More Deaths has publicly criticized the federal government's treatment of migrants and refugees. Indeed, only two months before the events in this case, No More Deaths issued a statement, widely reported in the media, calling a government raid on a No More Deaths medical camp in Arivaca, Arizona "shameful."[7] Reacting to the negative press coverage in the incident's aftermath, a Border Patrol agent told the director of a Tucson non-profit organization that No More Deaths had "gone too far" and "messed with the wrong guy." Doc. 83, Ex. 8 at 2 (declaration of non-profit director). He also stated that Border Patrol had intentions to "shut them down." *Id.* And before that, No More Deaths volunteers had filmed and publicized government agents' destruction of humanitarian aid in the desert—e.g., by slashing and kicking water jugs.[8]

---

[7] *See, e.g.*, Tom Dart, "'Shameful' Raid on Aid Camp at U.S.-Mexico Border Puts Lives at Risk, Volunteers Say," *The Guardian* (June 16, 2017), www.theguardian.com/us-news/2017/jun/16/us-mexico-border-aid-camp-raid.
[8] *See* Fernanda Santos, "Border Patrol Raids Humanitarian Aid Group Camp in Arizona," *The New York Times* (June 16, 2017), www.nytimes.com/2017/06/16/us/border-patrol-

This stark evidence of discriminatory effect and purpose compels a finding of unconstitutional selective enforcement on the basis of the defendants' association with a disfavored group. No government action could be more antithetical to our Nation's values. *See, e.g.*, *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1949 (2018) ("[T]he First Amendment prohibits government officials from retaliating against individuals for engaging in protected" activities). As in *Steele*, the defendants' convictions should be reversed. 461 F.2d at 1152; *see Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886) (dismissal of criminal proceedings is proper remedy for selective enforcement).

### B.      At a Minimum, the Case Should Be Remanded For Discovery

The standard for obtaining discovery on a selective-enforcement claim is not "rigorous." *Sellers*, 906 F.3d at 855. "While a defendant must have *something* more than mere speculation to be entitled to discovery, what that *something* looks like will vary from case to case." *Id.* "[A] defendant need not," for example, "proffer evidence that similarly-situated individuals" did not face enforcement "to receive discovery." *Id.* And even if a defendant could "present[] no evidence of discriminatory effect, evidence of discriminatory intent may be enough to warrant discovery"—and vice versa. *Id.* at 856.

Despite this lenient standard, the magistrate judge denied the defendants discovery on their selective-enforcement claims. Doc. 136, at 7-8. Although this Court reviews that decision for abuse of discretion, *Sellers*, 906 F.3d at 851, a judge necessarily abuses his discretion by applying the wrong legal standard, *see United States v. Hinkson*, 585 F.3d 1247, 1261 (9th Cir. 2009) (en banc). Here, the magistrate judge did just that.

While the judge cited *Sellers*, Doc. 136, at 8, which recently established the Ninth Circuit's discovery standard for selective-enforcement claims, he ignored its core principles. The magistrate judge denied the defendants' discovery request on the ground that that they were "unable to point out any other persons similarly acting who are not being prosecuted." Doc. 136, at 8. But *Sellers* expressly holds that "a defendant need *not* proffer evidence that similarly-situated individuals . . . were not investigated or arrested to

immigration-no-more-deaths.html (describing these events).

receive discovery on his selective enforcement claim." 906 F.3d at 855 (emphasis added). Thus, not only did the magistrate judge ignore that the defendants *had* presented evidence of similarly situated offenders not being referred for prosecution, *see supra* at 18, but *Sellers* specifically barred him from requiring such evidence as a condition of discovery in the first place. It is difficult to imagine a clearer abuse of discretion.

Under the proper legal standard—whether the defendants "have *something* more than mere speculation," *Sellers*, 906 F.3d at 855—discovery is clearly warranted. As noted, the defendants proffered evidence of a recent spate of prosecution referrals by FWS agents for No More Deaths volunteers' low-level infractions. *See supra* at 18. And although it is not necessary, the defendants (contrary to the magistrate judge) *did* also present evidence that similarly situated non-No More Deaths offenders have not been referred for prosecution. *See id.* In any event, even if the defendants lacked all this discriminatory-effect evidence, their discriminatory-intent evidence alone should have been "enough to warrant discovery." *Sellers*, 906 F.3d at 856; *see supra* at 19-21. At the very least, then, this Court should remand for discovery on the defendants' selective-enforcement claims. *See Sellers*, 906 F.3d at 856 (remanding for discovery where district court applied wrong legal standard in denying defendant's selective-enforcement claim).

## III.   DEFENDANTS WERE ENTRAPPED BY ESTOPPEL, IN VIOLATION OF THE DUE PROCESS CLAUSE

The Due Process Clause "prohibits convictions based on misleading actions by government officials." *United States v. Batterjee*, 361 F.3d 1210, 1216 (9th Cir. 2004). From this principle flows the entrapment by estoppel defense: "the unintentional entrapment by an official who mistakenly misleads a person into a violation of the law." *Id.* To prevail on such a defense, a defendant must show that she "reasonabl[y] . . . relied on" the government's misleading actions. *United States v. Tallmadge*, 829 F.2d 767, 776 (9th Cir. 1987). Because entrapment by estoppel "focuses on the conduct of the government officials rather than on a defendant's state of mind," it "can be raised as a defense to offenses"—like those in this case—"that do not require proof of specific

intent." *Batterjee*, 361 F.3d at 1218. This Court "review[s] de novo" the magistrate judge's "legal conclusion that an entrapment by estoppel defense is unavailable." *Id.* at 1216.

Here, government officials misled the defendants in two respects. First, at a meeting just over one month before the incident in this case, a lawyer from the Arizona U.S. Attorney's Office told leaders of No More Deaths that the Office had no interest in prosecuting No More Deaths volunteers who left food and water in the desert. Tr. 2:66-67; *see also* Doc. 70, Exs. A-B (declarations of No More Deaths leader John Fife and lawyer William Walker describing meeting). An FWS official taking notes at the meeting wrote that "DOJ does not appear to want to prosecute violations regarding this group" and that cases are "not prosecuted" so long as the person "shows up to court" and accepts a civil infraction. Tr. 2:67. The No More Deaths leaders present at that meeting conveyed this information to No More Deaths volunteers, including the defendants. Tr. 2:160; 2:162; 2:191; 3:23; 3:64; 3:90; 3:109.

Second, the Cabeza Prieta Refuge access permit application (issued by FWS) strongly suggests that no criminal penalties are possible for the defendants' violations. Paragraph 13 of that application states that those who leave water or food on the refuge "may be subject to judicial penalties to include fines, civil action, and/or debarment." FWS Permit Application at 2 (Doc. 70, Ex. C at 2). Meanwhile, the application elsewhere expressly mentions "criminal charges" for other violations not at issue here. *Id.* The express mention of criminal punishment in one penalty provision implicitly precludes such punishment in Paragraph 13, which references only civil liability. *See, e.g.*, *Marx v. Gen Rev. Corp.*, 568 U.S. 371, 384 (2013) (use of "explicit language" in one provision "cautions against inferring" the presence of such language elsewhere).

The defendants in turn "relied on" the government's misrepresentations. *Tallmadge*, 829 F.2d at 776. They testified that, in light of those representations, criminal prosecution was not "something that they considered possible." Tr. 3:51; *see* Tr. 3:63-65. Their reliance, moreover, can hardly be deemed "[un]reasonable." *Batterjee*, 361 F.3d at

1216. They simply listened to instructions delivered by their organization's leaders—leaders who personally attended the meeting at which the government made its assurances. And they simply read the permit application's plain language, which precludes criminal penalties for the precise conduct they engaged in. Indeed, in *Batterjee*, the court held that the defendant reasonably relied on a similar form, which "did not expressly state that an alien legally in the country on a non-immigrant visa *could* purchase a firearm," but instead listed "illegal presence in the United States" as the only "immigration-related basis for" ineligibility. 361 F.3d at 1218 (emphasis added). Here, even though the permit application never "expressly state[s]" that leaving food and water is *not* a criminal offense, it implies as much by referencing criminal penalties for other violations. *Id.* As in *Batterjee*, anyone in the defendants' shoes "would have accepted the [government's] information as true." *Id.* at 1217.

Because government officials "misled" the defendants "as to the consequences" of their actions, and the defendants reasonably relied on the government's misleading actions, "it [is] fundamentally unfair to convict them." *United States v. Harrington*, 749 F.3d 825, 829 (9th Cir. 2014). As a result, their convictions must be reversed. *See id.* at 830 (reversing defendant's conviction where government misinformed him of consequences of refusing to submit to blood-alcohol test).

## IV. DEFENDANTS' CONVICTIONS ON COUNTS II AND III VIOLATE THE ADMINISTRATIVE PROCEDURE ACT

The Administrative Procedure Act (APA) requires federal administrative agencies (such as FWS) to engage in a process of public notice and comment before promulgating "substantive rules of general applicability." 5 U.S.C. § 552(a)(D); *see id.* § 553 (setting forth notice-and-comment procedures); *United States v. Valverde*, 628 F.3d 1159, 1162 (9th Cir. 2010). Congress based this requirement on "notions of fairness and informed administrative decisionmaking." *Paulsen v. Daniels*, 413 F.3d 999, 1004 (9th Cir. 2005). Indeed, notice and comment is the primary "procedure by which the persons affected by [agency] rules are enabled to communicate their concerns in a comprehensive and

1   systematic fashion to the legislating agency." *Hoctor v. U.S. Dept. of Agric.*, 82 F.3d 165,

2   171 (7th Cir. 1996). This Court "review[s] de novo" the magistrate judge's determinations

3   about the "requirements imposed by the APA." *Nat. Res. Def. Council v. Evans*, 316 F.3d

4   904, 910 (9th Cir. 2003).

5          Substantive rules subject to notice and comment are those that "effect a change in

6   existing law or policy" or "affect[] individual rights and obligations." *W.C. v. Bowen*, 807

7   F.2d 1502, 1504 (9th Cir. 1987) (quotation and alteration omitted); *see Hemp Indus. Ass'n

8   v. DEA*, 333 F.3d 1082, 1087 (9th Cir. 2003) (substantive rules "impose obligations or

9   effect a change in existing law"). In *Bowen*, for instance, a new agency rule led the agency

10  secretary to review administrators' benefit decisions more frequently than he did under

11  "existing policy" and "prior practice." 807 F.2d at 1504-05. Because the rule therefore

12  "changed existing policy" and also affected benefit recipients' rights, it was "substantive"

13  and "required notice and comment rulemaking." *Id.*

14         Like the rule in *Bowen*, FWS' amendment to the refuge permit application was a

15  substantive rule because it significantly changed the regulatory status quo and affected

16  individual rights. Before July 2017, the permit application did not require applicants to

17  aver that they would not leave food, water bottles, or medical supplies on the refuge. *See

18  supra* at 5. Accordingly, the permit requirements did not affect No More Deaths

19  volunteers, and FWS "always gave them the permits." Tr. 2:31 (statement of refuge

20  manager). In July 2017, however, FWS amended the permit application by adding a new

21  prohibition against "abandon[ing] personal property or possessions" and defining

22  "personal property or possessions" to include "water bottles, water containers, food, food

23  items, food containers, blankets, clothing, footwear, [and] medical supplies." FWS Permit

24  Application at 2 (Doc. 70, Ex. C at 2). That amendment altered "existing policy" and

25  "prior practice," while also specifically affecting the "individual rights and obligations" of

26  No More Deaths volunteers. *Bowen*, 807 F.2d at 1504-05. It was therefore a substantive

27  rule requiring notice and comment.

28         The FWS permit-application amendment also bears two other hallmarks of a

substantive rule. First, it "sets forth [a] legally binding requirement[] for a private party to obtain a permit"—namely, the requirement that the applicant not provide humanitarian aid on the refuge. *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251-52 (D.C. Cir. 2014). Such agency actions are substantive rules. *Id.* Second, as evidenced by this case, the "rule establishes a criminal offense entailing possible imprisonment for the violator." *United States v. Picciotto*, 875 F.3d 345, 348 (D.C. Cir. 1989). Agency rules in that category, too, are substantive. *Id.*

If there were any doubt about whether FWS' permit-application amendment is a substantive rule, it should be resolved in the defendants' favor. It is well established that "a criminal prosecution founded on an agency rule should be held to the strict letter of the APA." *Id.* at 346; *accord United States v. Cain*, 583 F.3d 408, 422 (6th Cir. 2009). That tie-breaking principle stems from the "liberty interest at stake in a criminal proceeding." *United States v. Reynolds*, 710 F.3d 498, 515 (3d Cir. 2013) (vacating defendant's conviction due to APA violation). Such a liberty interest is implicated here even though the defendants received no jail time, as their convictions will remain on their records forever if not overturned, carrying with them substantial "collateral consequences" for, among other things, employment, housing, and social services. *United States v. Juvenile Male*, 564 U.S. 932, 936 (2011).

Because FWS' permit-application amendment was a substantive rule, the agency had to promulgate it through notice and comment. *See supra* at 5. Instead, FWS ignored that participatory process and simply amended the application internally. Tr. 2:44; 2:47-48 (refuge manager admitting that the agency instituted the change without notice and comment). In so doing, the agency denied citizens—including No More Deaths and its members—their opportunity for "public input" and failed to "ensure fair treatment for persons to be affected by" the rule. *Cain*, 583 F.3d at 420.

Where, as here, an agency rule "violates the APA," that rule is "void." *Bowen*, 807 F.2d at 1505. In turn, any "[a]gency action taken under a void rule has no legal effect." *Id.* The defendants' convictions on Counts II and III (failure to obtain a permit and

abandonment of personal property) would not have occurred were it not for the void rule. After all, absent that defective rule, the permit application would not have barred the defendants' activities, and they would have obtained a permit. *See* Tr. 2:164; 3:92; 3:99 (defendants stating that they did not obtain permits because of the rule change); 3:61 (Hoffman stating that she had obtained a permit prior to the rule change). The defendants need not have obtained a permit first and then challenged the permit application as invalid later: to the contrary, regulated parties have often successfully challenged underlying permit requirements as a defense to enforcement actions brought against them for failure to obtain a permit. *See, e.g.*, *Rapanos v. United States*, 547 U.S. 715, 729, 757 (2006) (vacating enforcement action against private party for failure to obtain permit, where permit requirement was defective). Because the defendants' convictions on Counts II and III were based on an invalid rule and have "no legal effect," they must be reversed. *Bowen*, 807 F.2d at 1505; *see Valverde*, 628 F.3d at 1168-69 (affirming dismissal of indictment because agency rule on which indictment was based "failed to comply with the APA's notice and comment procedures").

## **CONCLUSION**

For the foregoing reasons, the defendants' convictions should be reversed.

1

2

Respectfully submitted,

*/s/ Jonathan D. Hacker*

3  Dated: April 15, 2019

4

5

6

7

8

9

Anne Chapman (State Bar No. 025969)
MITCHELL, STEIN, CAREY, CHAPMAN, PC
One Renaissance Square
2 North Central Avenue, Suite 1450
Phoenix, AZ 85004
anne@mscclaw.com
Telephone: (602) 388-1232

Jonathan D. Hacker*
Ephraim McDowell*
O'MELVENY & MYERS LLP
1625 Eye St. NW
Washington, DC 20006
(202) 383-5300
jhacker@omm.com
emcdowell@omm.com

10

11

*Counsel for Defendants*

* admitted pro hac vice

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on April 15, 2019, I electronically transmitted a PDF version

of this document to the Clerk of Court, using the CM/ECF System, for filing and for

transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Nathaniel J. Walters, Esq. (email: Nathaniel.walters@usdoj.gov)
Anna R. Wright, Esq. (email: Anna.wright@usdoj.gov)
Assistant U.S. Attorneys
United States Courthouse
405 W. Congress Street, Ste. 4800
Tuscon, AZ 85701
Attorneys for Plaintiff

*/s/ Jonathan D. Hacker*
Jonathan D. Hacker