MICHAEL BAILEY
United States Attorney
ANNA WRIGHT
Assistant U.S. Attorney
NATHANIEL J. WALTERS
Assistant U.S. Attorney
State Bar No.: 029708
405 West Congress, Suite 4800
Tucson, Arizona  85701-5040
Telephone: (520) 620-7300
E-mail: anna.wright@usdoj.gov
        nathaniel.walters@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | 19-CR-00693-RM |
| Plaintiff, | GOVERNMENT'S ANSWERING MEMORANDUM REGARDING DEFENDANTS' APPEAL OF CONVICTION AFTER BENCH TRIAL |
| vs. | |
| Natalie Renee Hoffman, Oona Meagan Holcomb, Madeline Abbe Huse, and Zaachila Isabel Orozco-McCormick, | |
| Defendants. | |

The United States of America, by and through its undersigned attorneys, hereby answers the defendants' Opening Memorandum in Support of Reversal of Magistrate Judge's Judgement of Conviction. Doc. 8. The government respectfully requests that this Court affirm the defendants' convictions and deny them the relief they seek.

## **MEMORANDUM**

### I.    **Issues Presented**

(a) Whether, viewing the evidence in the light most favorable to the government, the Magistrate Judge correctly found that the defendants failed to establish that the prosecution in this matter substantially burdened their sincerely held religious beliefs.

(b) Whether the Magistrate Judge correctly found that the defendants failed to meet their burden to establish a selective enforcement claim, either as to a substantive claim or to obtain disclosure, where they presented no evidence tending to show discriminatory effect or intent.

(c) Whether the Magistrate Judge correctly found that the defendants failed to meet their burden to establish an entrapment by estoppel defense where the defendants presented no evidence to establish any of the four elements of the defense.

(d) Whether the Magistrate Judge correctly found that the defendants Due Process rights were not implicated by the addition of clarifying language to a hold harmless agreement that the defendants purposefully did not sign.

## II.   Statement of the Case

### a.  Procedural History

On August 13, 2017, the defendants entered the Cabeza Prieta National Wildlife Refuge (CPNWR) without obtaining the required permit and drove on a restricted administrative road in order to leave behind plastic one-gallon jugs of water and other items, all in violation of the regulations governing the CPNWR. (CR 17).[1] The government later charged the defendants by Information with violations of the regulations governing the access to and use of the CPNWR. (CR 1).

In January 2019, the Magistrate Court presided over a three-day trial. The government presented the testimony of United States Fish and Wildlife (USFWS) Officers Michael West and Brian Krukoski in its case-in-chief, and USFWS Refuge Supervisor Juliette Fernandez in rebuttal. (CR 158, 161). The defendants each testified and presented various witnesses. (CR 158-159, 161). After closing arguments, the Court took the matter under advisement and later delivered a guilty verdict as to all defendants on all counts. (CR 161, 166). The Court then sentenced the defendants each to 15 months of unsupervised probation and a $250 fine. (CR 183-86). The defendants then timely appealed. (CR 189).

---

[1] "CR" refers to the Clerk's Record, followed by the document number(s).

**b.  Statement of Facts**

**i.  The CPNWR**

The CPNWR is a federal wilderness refuge located between Wellton and Ajo, Arizona. (RT 1/15/19 at 123). [2] The primary purpose of the CPNWR is the conservation of wildlife and plant resources. (RT 1/16/19 at 8; RT 1/17/19 at 127-31). The CPNWR is bordered on the east, west and north by other public lands, and on the south by the international border with Mexico. (RT 1/15/19 at 123, 136). The CPNWR's southern border is 56 miles long. (RT 1/15/19 at 123).

All members of the public are required to obtain permits prior to entering the CPNWR and must sign a hold harmless agreement as part of the permitting process. (RT 1/15/19 at 28-29, 125, 127-28; RT 1/16/19 at 60; RT 1/17/19 at 141). The requirement to sign the hold harmless agreement applies to all members of the public wishing to enter the CPNWR, the Barry M. Goldwater Aerial Gunnery Range (BGMR), the Sonoran National Monument, and the Sonoran Desert National Monument. (RT 1/15/19 at 29; Government's Exhibit 2).[3] The hold harmless agreement was implemented at the request of the managers of the BGMR, because they were concerned about liability in connection with unexploded ordinance on the BMGR. (RT 1/16/19 at 57-58).

Within the CPNWR, there are various roads. Some of the roads are open to the public, while others are not. (RT 1/15/19 at 26-27; RT 1/17/19 at 142-44). Charlie Bell Road is the road at issue in this case. From the eastern boundary to Charlie Bell Pass, Charlie Bell Road is open to the public. (RT 1/15/19 at 26). Charlie Bell Pass is an open area approximately 15 to 20 miles inside the CPNWR where visitors may leave their vehicles to hike further into the CPNWR. (RT 1/15/19 at 20, 34-35, 123-24). The Border Patrol maintains a rescue beacon at Charlie Bell Pass. (RT 1/15/19 at 35, 39, 156; RT 1/16/19 at 15).

---

[2] "RT" refers to the Reporter's Transcript, followed by a date and page number(s).

[3] The government will provide a copy of its admitted exhibits separately to this Court for its review.

At Charlie Bell Pass, Charlie Bell Road enters a designated wilderness area and continues through the CPNWR to the west for several miles. (RT 1/15/19 at 20, 27, 63). This portion of Charlie Bell Road is closed to the public and may only be used by authorized personnel for limited purposes. (RT 1/15/19 at 20, 126; RT 1/17/19 at 144). Notice that this portion of Charlie Bell Road is closed to the public is given through the permitting process and a large map at the sign-in kiosk on the eastern side of the CPNWR, as well as two signs next to Charlie Bell Road as it continues west out of Charlie Bell Pass. (RT 1/15/19 at 27-28; Government's Exhibits 19-22). There is another sign approximately one to two miles west of Charlie Bell Pass, just beyond Charlie Bell Well. (RT 1/15/19 at 27-28, 42-43, 124; Government's Exhibits 19-22, 24). Charlie Bell Well is an animal drinker that also can supply water for people. (RT 1/15/19 at 124).

### ii.  The July 2017 Hold Harmless Agreement

In July 2017, the land managers for the CPNWR, the BMGR, the Sonoran National Monument, and the Sonoran Desert National Monument changed the hold harmless agreement to include Paragraph 13. (RT 1/15/19 at 149-50; RT 1/16/19 at 43-48). CPNWR Refuge Manager Sid Slone participated in the discussions leading up to the changes on behalf of USFWS. (RT 1/15/19 at 144-48, 150-51; RT 1/16/19 at 47-48). Paragraph 13 explicitly informed permit holders that they could not leave certain items on any of the lands covered by the hold harmless agreement, including the CPNWR. (*See* Government's Exhibit 2). The hold harmless agreement in place prior to July 2017 did not allow permit holders to leave supplies on the CPNWR, and the July 2017 hold harmless agreement made this explicit. (RT 1/16/19 at 59-60).

### iii.  The Offense

On the morning of August 13, 2017, with Defendant Hoffman driving, the defendants entered the CPNWR from Ajo, Arizona, in a white pick-up truck using Charlie Bell Road. (RT 1/16/19 at 163-70; RT 1/17/19 at 91, 98). The bed of the truck was packed almost completely full with green milk crates containing one-gallon water jugs and cans of beans that the defendants intended to leave behind on the CPNWR. (RT 1/15/19 at 44; *see*

*also* RT 1/16/19 at 166; RT 1/17/19 at 25, 98-99). Prior to entering the CPNWR that day, the defendants purposely chose not to get the required permit because they disagreed with certain portions of the hold harmless agreement. (RT 1/15/19 at 80-81, 128-30; RT 1/16/19 at 168, 175, 178, 187; RT 1/17/19 at 22-23, 27-28, 39, 62, 65-66, 92, 99-100).

The defendants eventually reached Charlie Bell Pass. (RT 1/15/19 at 20, 123-24). Despite the clearly posted signs indicating that the public was not allowed to drive on the western portion of Charlie Bell Pass, Defendant Hoffman drove on the restricted portion of Charlie Bell Road past the signs at Charlie Bell Pass to Charlie Bell Well. (RT 1/16/19 at 168; RT 1/17/19 at 30-31, 94, 102-03). At Charlie Bell Well, the defendants left a large cache of supplies, including green milk crates filled with 70 one-gallon water jugs and 64 cans of beans. (RT 1/15/19 at 40-42, 56, 63; RT 1/16/19 at 168-69; RT 1/17/19 at 32, 67-68, 94; Government's Exhibit 3). They left the cache of supplies for others to take and use, and they had no intention of picking them back up before they left the CPNWR that day. (RT 1/16/19 at 169, 179-80; RT 1/17/19 at 32-33, 103-04).

A law enforcement trail camera in the area captured images of the white truck driving westbound on the restricted portion of Charlie Bell Road at 11:31 a.m., returning eastbound at 12:22 p.m., and then driving westbound again at 12:39 p.m. (RT 1/15/19 at 18-26; Government's Exhibits 11-15). The images from the trail camera show that the defendants made at least two trips in the white truck on the restricted portion of Charlie Bell Road on August 13, 2017.  (RT 1/15/19 at 26; RT 1/17/19 at 33-34, 74, 94, 104-05). The trail camera is located in a designated wilderness area and everything it records is also in a designated wilderness area. (RT 1/15/19 at 20).

Still driving on the restricted portion of Charlie Bell Road and in a designated wilderness area, Defendant Hoffman eventually drove 1.8 miles past Charlie Bell Pass and parked the truck. (RT 1/15/19 at 44, 57-58, 63-64; RT 1/16/19 at 170, 180; RT 1/17/19 at 34, 68, 94, 105; Government's Exhibits 25-28). The defendants then all hiked south into the CPNWR, where they left various supplies for others to take and use as they saw fit. (RT 1/15/19 at 46; RT 1/16/19 at 180-81; RT 1/17/19 at 17-18, 34-37, 68, 105-06).

By the time the defendants hiked back to the truck, Officer West was waiting for them. (RT 1/15/19 at 46-47; RT 1/17/19 at 37, 106). Officer West recorded his encounter with the defendants using his body camera. (RT 1/15/19 at 61-63; Government's Exhibit 40). When asked by Officer West, the defendants all admitted that they intentionally did not get permits to be on the CPNWR. (RT 1/15/19 at 50-51; RT 1/17/19 at 106). The defendants also all admitted that they left the cache of supplies Officer West found at Charlie Bell Well. (RT 1/15/19 at 52). When asked by Officer West if she knew she was driving in a designated wilderness area and if she saw the signs on Charlie Bell Road, Defendant Hoffman said she did not know she was in a designated wilderness area and did not see the signs along the road. (RT 1/15/19 at 48-49). However, Defendant Hoffman did admit that she hiked in the CPNWR two years earlier. (RT 1/15/19 at 51).

Officer West told the defendants that, since they did not have permits, they were trespassing on the CPNWR and had to leave immediately. (RT 1/15/19 at 51; RT 1/17/19 at 37). He followed the defendants as they drove back the way they came on Charlie Bell Road. (RT 1/15/19 at 52; RT 1/17/19 at 37-38; Government's Exhibits 9-10). At Charlie Bell Well, Officer West stopped to pick up the supplies left there by the defendants. (RT 1/15/19 at 52-53; RT 1/17/19 at 38). Everyone then drove out of the CPNWR and met at the USFWS office in Ajo. (RT 1/15/19 at 54-55; RT 1/1/7/19 at 37-38). There, Officer West took photographs of the items he collected at Charlie Bell Well and then gave them back to the defendants. (RT 1/15/19 at 55; RT 1/17/19 at 38; Government's Exhibits 35-36).

Officer West did not issue the defendants ticket that day, but later submitted the matter to the United States Attorney's Office (USAO) for possible prosecution. (RT 1/15/19 at 82, 84, 120-21). As discussed above, the USAO later filed an Information charging the defendants with violations of the regulations governing the CPNWR.

///

1   **III.    Argument**

2       **a.  Standard of Review**

3       On appeal to this Court, the defendants are not entitled to a trial *de novo*. Fed. R.

4   Crim. P. 58(g)(2)(D). Rather, "[t]he scope of the appeal is the same as in an appeal to the

5   court of appeals from a judgment entered by a district judge." *Id.* Accordingly, the same

6   standard of review applies to an appeal of a judgement of conviction, whether it is a district

7   or a court of appeal hearing the appeal. *United States v. Stanton*, 501F.3d 1093, 1099 (9th

8   Cir. 2007); *see also United States v. McDermott*, 589 Fed.Appx. 394, 395 (9th Cir. 2015).

9       **b.  Religious Freedom Restoration Act[4]**

10          **i.   Standard of Review**

11      After a bench trial resulting in a criminal conviction, the court's "conclusions of law

12  are reviewed *de novo* and findings of fact are reviewed for clear error." *United States v.*

13  *Temkin*, 797 F.3d 682, 688 (9th Cir. 2015). The standard for reviewing the sufficiency of

14  the evidence to support a criminal conviction is whether, "viewing the evidence in the light

15  most favorable to the prosecution, any rational trier of fact could have found the essential

16  elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319

17  (1979); *see Temkin*, 797 F.3d at 688. This standard is "highly" or "exceedingly" deferential

18  to the verdict. *United States v. Lukashov*, 694 F.3d 1107, 1118 (9th Cir. 2012). All

19  reasonable inferences that may be drawn from the evidence are to be drawn in the

20  government's favor. *United States v. Heuer*, 4 F.3d 723, 731 (9th Cir. 1993); *United States*

21  *v. Reese*, 775 F.2d 1066, 1071 (9th Cir. 1985). The reviewing court is required to "respect

22  the exclusive province of the fact-finder to determine the credibility of the witnesses,

23  resolve evidentiary conflicts, and draw reasonable inferences from proven facts, by

24  assuming that the fact-finder resolved all such matters in a manner which supports the

25  verdict." *United States v. Khatami*, 280 F.3d 907, 910 (9th Cir. 2002).

26

27  [4] The government incorporates by reference its arguments made in its Response to
28  Defendants' Motion to Dismiss Charges Pursuant to the Religious Freedom Restoration
    Act. (CR 97).

**ii. Legal Summary**

To establish a *prima facie* claim under the Religious Freedom Restoration Act (RFRA) of 1993, codified as 42 U.S.C. § 2000bb, a defendant must present evidence that (1) the defendant's activities were an "exercise of religion," and (2) the government action "substantially burdened" the defendant's exercise of religion. 42 U.S.C. § 2000bb-1(a); *Navajo Nation v. United States Forest Serv.*, 535 F.3d 1058, 1068-69 (9th Cir. 2008). To do this she must first articulate the scope of her beliefs, and then show that her beliefs are religious in nature, that they are sincerely held, and that the exercise of her sincerely held beliefs is substantially burdened by a government action. *United States v. Zimmerman*, 514 F.3d 851, 853 (9th Cir. 2007). To establish that a criminal prosecution constitutes a substantial burden on a defendant's sincerely held religious belief, a defendant must show that she was coerced to act contrary to her sincerely held religious beliefs by the threat of criminal sanctions. *Snoqualmie Indian Tribe v. F.E.R.C.*, 545 F.3d 1207, 1214 (9th Cir. 2008) (quoting *Navajo Nation*, 535 F.3d at 1070).

Only once a defendant has established both elements of her *prima facie* case does the burden shift to the government to demonstrate that the "substantial burden" posed by the government action is (1) in furtherance of a compelling governmental interest, and (2) the least restrictive means of furthering that compelling governmental interest. *Navajo Nation*, 535 F.3d at 1068 (citing 42 U.S.C. § 2000bb–1(b)).

**iii. Discussion**

**1. Religious or Spiritual Nature of Beliefs**

Taking the evidence and all reasonable inferences in the light most favorable to the government, the Magistrate Court correctly concluded that the defendants failed to establish at trial that their beliefs are religious in nature because they did not explain how their beliefs fit within their particular system of religious or spiritual beliefs, as opposed to being "'purely secular' philosophical concerns." *Callahan v. Woods*, 658 F.2d 679, 683 (9th Cir. 1981). None of the defendants explained how their beliefs relate to "1) ultimate ideas; 2) metaphysical beliefs; 3) moral or ethical systems; 4) comprehensiveness of

beliefs; and 5) accouterments of religion." *United States v. Lepp*, 2008 WL 3843283 at *4 (N.D. Cal. Aug. 14, 2008), aff'd, 446 Fed.Appx. 44 (9th Cir. 2011) (citing *United States v. Meyers*, 95 F.3d 1475, 1483-84 (10th Cir. 1996)).

For example, Defendant Holcomb testified that her beliefs were "very similar" to John Fife's but then almost immediately said that she and John Fife "probably speak about them and have lived them in different ways[,]" leaving the Magistrate Court with no information about what her beliefs and practices actually were. (RT 1/16/19 at 148-49). The only description that she offered of her specific beliefs was that she has "a deep spiritual need and a calling to do work based on what I believe in the world." (RT 1/16/19 at 149). A rational trier of fact could find that her bare-bones testimony about her beliefs failed to show that her beliefs were religious or spiritual in nature.

The other defendants testified in a similar manner, only describing their beliefs in the broadest terms and giving no indication about how those beliefs relate to life's ultimate questions. Defendant Orozco-McCormick testified only that her belief that "it was necessary to love everyone" led her to work with No More Deaths, and that she believes in the "sanctity of life" and that "everybody who walks on this earth should be able to drink some water." (RT 1/17/19 at 13-14, 16). Defendant Hoffman testified only that she "more or less" agreed with John Fife's testimony about No More Deaths being a "spiritual organization," that she felt a "spiritual connection" to her work with No More Deaths, and that both life and water are sacred. (RT 1/17/19 at 54-55, 61). Defendant Huse testified only that she believes in "love and compassion and kindness and the sanctity of human life," and that "agree[s] with a lot of John Fife's beliefs, and along with the UUC, the Unitarian Church." (RT 1/17/18 at 96-97).

Taking the evidence and all reasonable inferences in the light most favorable to the government, including the barebones descriptions of the defendants' asserted beliefs, a rational trier of fact could conclude that the defendants failed to explain how their beliefs fit within their particular system of religious or spiritual beliefs and that those beliefs were

political in nature, rather than spiritual or religious. *See Welsh v. United States*, 398 U.S. 333, 339 (1970) (discussing *United States v. Seeger*, 380 U.S. 163, 185 (1965)).

In fact, a rational trier of fact could reasonably conclude that the defendants' asserted beliefs were a simple recitation "for the purpose of draping religious garb over" their political activity, *see Christie*, 825 F.3d at 1056, and not simply religious beliefs that overlapped with the political beliefs of others, *see Burwell v. Hobby Lobby Stores*, 573 U.S 682, 700-04 (2014). Throughout the trial, the defendants presented evidence about the relative efficacy of certain strategies for saving lives in the CPNWR, including evidence about their mapping and data logging systems, to make their point that they did not believe that the government's approach was effective. (*See e.g.* Testimony of Dr. Hess; Testimony of Dr. McCullough; *see also* RT 1/16/19 at 151-52). In addition, Defendant Holcomb testified that she chose to leave supplies on the CPNWR to help illegal immigrants because, unlike rescue beacons, it would not lead to deportation, and that her decision was part of a political strategy. (RT 1/16/19 at 146-147, 161-62, 185). These arguments and beliefs are clearly political, not religious, in nature.

For the reasons discussed above, taking all of the evidence and reasonable inferences in the light most favorable to the government, a rational trier of fact could reasonably conclude that the defendants failed to establish the religious or spiritual nature of their asserted beliefs and that the defendants' asserted beliefs were, in fact, entirely political in nature.

## 2.  Substantial Burden

Taking all of the evidence and reasonable inferences in the light most favorable to the government, a rational trier of fact could conclude that the defendants also failed to establish at trial that this prosecution constitutes a substantial burden because their only evidence as to substantial burden is that they were required, like all other members of the general public, to comply with the regulations governing the CPNWR. The regulations are in place to protect and preserve the CPNWR for the use by all members of the public, not just the defendants. (*See* RT 1/17/19 at 127-132, 141-42). As the Ninth Circuit reasoned in

*Navajo Nation*, the government may take actions on its own land that "will 'virtually destroy [an individual's] ability to practice their own religion'" without creating a substantial burden on that individual's religion when those actions benefit the general public. 535 F.3d at 1072 (quoting *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 451-53 (1988)). This is because

> [the] government simply could not operate if it were required to satisfy every citizen's religious needs and desires. A broad range of government activities…will always be considered essential to the spiritual well-being of some citizens, often on the basis of sincerely held religious beliefs. Others will find the very same activities deeply offensive, and perhaps incompatible with their own search for spiritual fulfillment and with the tenets of their religion.

*Lyng*, 485 U.S. at 451-53.

Also, nothing in the defendants' trial testimony showed that their beliefs required them to enter the CPNWR without the proper permits, drive on a restricted administrative road, or abandon personal property in violation of the regulations governing CPNWR. As Defendant Huse testified, there are ways of providing aid to aliens crossing illegally into the United States that do not violate the law. (RT 1/17/19 at 112-114). In addition, nothing in the defendants' testimony showed that their beliefs required them to enter the CPNWR at all, since there were other locations available for them to place their caches of supplies. (*See* RT 1/17/19 at 112-114; *see also* Defendants' Exhibit 192 at 7-8)

It is clear that the defendants' preference for one method over another cannot create a substantial burden. *See Oklevueha Native American Church of Hawaii v. Lynch*, 828 F.3d 1012, 1016 (9th Cir. 2016). The defendants' reliance on *Holt v. Hobbs*, 135 S. Ct. 853 (2015), for the contrary position is misplaced. *See* Doc. 8 at 18-19. In *Holt*, the Supreme Court held that the "'substantial burden' inquiry asks whether the government has substantially burdened religious exercise…not whether the [ ] claimant is able to engage in other forms of religious exercise." 135 S. Ct. at 862. The fact that the prisoner-claimant could perform other parts of his religion, "such as by praying on a prayer rug, maintaining the diet required by his faith, and observing religious holidays," did not lessen the burden

of not being able to grow facial hair as required because of a prison regulation. *Id.* This case is easily distinguished, since the evidence shows that the defendants could have engaged in the same exercise of religion elsewhere and they make no claim that their particular actions on August 13, 2017, "serve[d] a unique religious function." *See Oklevueha*, 828 F.3d at 1016.

The defendants cannot show that this prosecution substantially burdens their religious exercise because they are being prosecuted only for violating the regulations that apply to the government's administration of its own land for the enjoyment of all. In addition, the evidence shows that they could exercise their asserted beliefs and comply with the regulations.

### 3.  Strict Scrutiny

Taking the evidence and all reasonable inferences in the light most favorable to the government, a rational trier of fact could find that the defendants failed to establish a *prima facie* RFRA claim. Similarly, a rational trier of fact could find that, even if the defendants established their *prima facie* RFRA claim, the government met its burden to demonstrate a compelling interest in enforcing the regulations at issue.

The government offered testimony through Refuge Manage Sidney Slone and Refuge Supervisor Juliette Fernandez about the particular challenges and requirements of managing the CPNWR in accordance with various statutes and principles of wilderness management. (*See e.g.* Testimony of Sidney Slone and Juliette Fernandez). Having heard this testimony, the Magistrate Judge correctly found, the defendants' violations of the regulations in this case "erode[d] the national decision to maintain the [CPNWR] in its pristine nature." (CR 166 at 2; *see also* RT 1/17/19 at 141-43, 151). Based on those concerns, the government had a compelling interest in enforcing the regulations to address these issues. (*See* CR 97 at 12-14). In addition, there were no less restrictive alternatives available since each of the actions taken by the defendants negatively impacted the CPNWR, their suggested alternatives do not address this harm in the slightest, and the

leadership of No More Deaths has indicated a commitment to violating the law no matter what. (RT 1/16/19 at 56-57; RT 1/17/19 at 149-51; Doc. 8 at 21-23).

### iv.  Conclusion

Taking the evidence in the light most favorable to the government, as well as all reasonable inferences, a rational trier of fact could find that the defendants failed to establish their *prima facie* claims and that the government, nevertheless, met its burden under strict scrutiny. Accordingly, the Magistrate Court correctly held that the defendants failed to establish their RFRA claim.

### c.  Selective Enforcement[5]

### i.  Legal Summary

To establish a selective enforcement claim, a defendant bears the burden of showing by clear evidence that the government's actions had a discriminatory effect and were motivated by a discriminatory purpose. *United States v. Armstrong*, 517 U.S. 456, 465 (1996); *see also United States v. Washington*, 869 F.3d 193, 214 (3rd Cir. 2017). To establish a discriminatory effect, a defendant must show that "similarly situated individuals…were not prosecuted." *Armstrong*, 517 U.S. at 465. To establish a discriminatory purpose, a defendant must show that law enforcement was motivated "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Wayte v. United States*, 470 U.S. 598, 610 (1985). On appeal, the Ninth Circuit "has employed both a *de novo* standard and a clearly erroneous standard when reviewing a selective prosecution claim." *United States v. Culliton*, 328 F.3d 1074, 1080-81 (9th Cir. 2003).

In order to obtain disclosure relevant to a selective enforcement claim, "a defendant must have *something* more than mere speculation to be entitled to discovery, what that *something* looks like will vary from case to case." *United States v. Sellers*, 906 F.3d 848,

---

[5] The government incorporates by reference its arguments made in its Response to Defendants' Motion to Dismiss for Selective Enforcement, or Alternatively, for Further Discovery Regarding Same. (CR 100).

855 (9th Cir. 2018) (emphasis in original). On appeal, discovery rulings are reviewed for an abuse of discretion. *See United States v. Soto-Zuniga*, 837 F.3d 992, 998 (9th Cir. 2016); *United States v. Mitchell*, 502 F.3d 931, 964 (9th Cir. 2007). However, reversal of a conviction for a discovery violation requires "that the error resulted in prejudice to substantial rights." *United States v. Amlani*, 111 F.3d 705, 712 (9th Cir. 1997) (internal quotations and citation omitted).

### ii.  Discussion

#### 1.  Pretrial Disclosure

Before trial, the defendants failed to meet their burden under *Sellers* to show that they were entitled to disclosure as to their selective enforcement claim by proffering something more than mere speculation. Accordingly, the Magistrate Judge did not abuse his discretion in denying the defendants disclosure as to these claims. At the time of the defendants' most recent demand for disclosure regarding their selective enforcement claim, they had amassed considerable information related to the enforcement of regulations on the CPNWR. (*See* CR 83-1 to 83-8). None of that information tended to support either that enforcement in this case had a discriminatory effect or was the result of a discriminatory intent.

Contrary to the defendants' assertion, they offered no information that other similarly situated individuals were not prosecuted. The proffered individuals were not similarly situated because they committed different offenses, did not commit their offenses willfully or intentionally, or they did not commit as many offenses. In addition, the defendants presented no testimony or evidence showing that these individuals were not members of No More Deaths. Similarly, prior to trial, the defendants offered no information showing that Officer West acted with a discriminatory intent. (*See* CR 100 at 8-9).

Finally, the defendants cannot now show that they were prejudiced by the denial of disclosure as to their selective enforcement claims. *See Amlani*, 111 F.3d at 712. In their most recent demand for disclosure, the defendants sought, for the years 2014 to 2018, all

communications between USFWS agents related "potential or actual enforcement action against No More Deaths volunteers[,]" as well as all documents related to enforcement actions regarding illegal driving on the CPNWR and entering the CPNWR without a permit. (CR 83 at 12). As shown at trial, the defendants were able to obtain a significant number of these documents through Freedom of Information Act requests and other methods, and they have not alleged any prejudice at this stage in the proceedings. (*See* RT 1/16/19 at 121; RT 1/17/19 at 9-10; Defendants' Exhibit 240; Doc. 8 at 27-28).

For the reasons discussed above, the Magistrate Judge correctly denied the defendants' pretrial demand for disclosure. Even if the Magistrate Judge erred, reversal of the defendants' conviction is not warranted because they were not prejudiced.

### 2.  Claim at Trial

At trial, the defendants continued to fall short of their burden. The sole evidence presented by the defendants as to discriminatory effect was the testimony of Robert Bartels. On direct examination, Mr. Bartels testified that he prepared a summary chart based on his review of information obtained from the Central Violations Bureau about certain incidents involving regulation violations on the CPNWR. (RT 1/16/19 at 117-18; Defendants' Exhibit 240). Mr. Bartels' testimony demonstrated that there was no evidence of others who were similarly situated to the defendants but not prosecuted. (RT 1/16/19 at 135-38). In fact, Mr. Bartels admitted on cross-examination that he had taken no steps to determine whether the individuals involved in the other incidents were members of No More Deaths. (RT 1/16/19 at 139-142).

The defendants' evidence related to discriminatory intent was similarly weak. At trial, the defendants presented the testimony of Refuge Manager Slone about certain steps he took to try to enforce the CPNWR's regulations. Refuge Manager Slone testified that he directed his employees to send anyone seeking permits who appeared to be a member of No More Deaths to him, because he believed No More Deaths members would likely intentionally violate the regulations. (RT 1/16/19 at 30-31, 59). Significantly, there was no testimony that members of No More Deaths were denied permits as a result of their referral

to Refuge Manager Slone. Refuge Manager Slone also testified that he began a "Do Not Issue" list after he learned that members of the public who were previously denied permits were going to the Phoenix Bureau of Land Management (BLM) office to get permits anyway. (RT 1/16/19 at 58-59). People were added to the list based on their deliberate violation of the regulations, not their membership in an organization. (RT 1/16/18 at 38, 40, 47). Finally, Refuge Manager Slone testified that the hold harmless agreement was changed in July 2017 to make explicit the prohibition against leaving anything behind. This change was not targeted solely at No More Deaths, as asserted by the defendants. *See* Doc. 8 at 25. Rather, this change was made to address "not only [No More Deaths] but other folks" leaving water out on the CPNWR and the other lands covered by the hold harmless agreement. (RT 1/16/19 at 46-47).

The defendants also rely on evidence not introduced at trial to support their selective enforcement claim. *See* Doc. 8 at 26. The government is unaware of and the defendants offer no legal authority that would allow this Court to consider evidence not introduced at trial in reviewing whether the defendants met their burden as to a trial defense. *United States v. Howard*, 381 F.3d 873 (9th Cir. 2004), cited by the defendants, is inapposite and deals with reviewing the district court record when considering a habeas petition.

For the reasons discussed above, the defendants failed to meet there burden as to their selective enforcement claim. They offered no evidence tending to show either discriminatory effect or intent. Therefore, whether the standard of review is *de novo* or clear error, their claim should be denied.

### d.  Entrapment by Estoppel[6]

#### i.  Legal Standard

"To establish the defense of entrapment by estoppel, a defendant has the burden to show: '(1) an authorized government official, empowered to render the claimed erroneous

---

[6] The government incorporates by reference its arguments made in its Response to Defendants' Motion to Dismiss Count III Under the Doctrine of Entrapment by Estoppel and Renewed Motion to Compel. (CR 96).

advice, (2) who has been made aware of all the relevant historical facts, (3) affirmatively told [the defendant] the proscribed conduct was permissible, (4) that [the defendant] relied on the false information, and (5) that [the] reliance was reasonable.'" *United States v. Lynch*, 903 F.3d 1061, 1076 (9th Cir. 2018) (internal quotations and citations omitted). Put another way, a defendant must show that the government announced that the charged criminal act is legal and that the defendant reasonably relied on that announcement such that "prosecution would be unfair." *United States v. Lechner*, 806 F.3d 869, 875 (6th Cir. 2015); *see also United States v. Burrows*, 36 F.3d 875, 882 (9th Cir. 1994); *United States v. Clegg*, 846 F.2d 1221, 1222 (9th Cir. 1988); *United States v. Tallmadge*, 829 F.2d 767, 773-75 (9th Cir. 1987). The asserted statements must have been made directly to the defendant, and defendant cannot rely on hearsay to avoid criminal liability. *See United States v. Brebner*, 951 F.2d 1017, 1027 (9th Cir. 1991). To assert this defense, the defendant bears the burden of proving that she was reasonable in believing that her conduct was sanctioned by the government. *See Burrows*, 36 F.3d at 882 (citing *United States v. Lansing*, 424 F.2d 225, 226-27 (9th Cir. 1970)).

On appeal, a defendant's entrapment argument is reviewed *de novo*. *See United States v. Sandoval-Mendoza*, 472 F.3d 645, 648 (9th Cir. 2006).

### ii.  Discussion

The defendants offer two potential basis for this defense. First, that an unnamed line AUSA said that the United States Attorney's Office (USAO) was not interested in prosecuting No More Deaths volunteers who left food and water in the desert. Doc. 8 at 29. Second, that the hold harmless agreement did not include criminal prosecution in the list of penalties for violating the agreement. Doc. 8 at 29-30). Both arguments are meritless.

Beginning with the supposed statements of the line AUSA, the defendants failed to establish even a single element. First, there was no evidence that a line AUSA had the authority to make promises about what offenses the USAO would prosecute.[7] In fact, the

---

[7] In fact, although not introduced at trial, the record in this case shows that the leadership of No More Deaths was aware that this line AUSA did not have this authority.

defendants' testimony as to who exactly made the statement was vague at best. (RT 1/16/19 at 160; RT 1/17/19 at 23, 40-41, 64, 75-76, 90, 109-10).

Second, there was no testimony that this line AUSA was made aware of all the material facts related to this prosecution, i.e. that the defendants or anyone else associated with No More Deaths would enter the CPNWR without permits, drive on a restricted road multiple times, and leave behind large caches of supplies. The defendants each admitted that they did not personally speak with anyone at the USAO or the USFWS prior to going out on the CPNWR on August 13, 2017, and that none of them took any steps to notify anyone at the USAO or the USFWS of their plans for that day. (RT 1/16/19 at 160; RT 1/17/19 at 23, 40-41, 64, 75-76, 90, 109-10).

Third, there was no testimony that this line AUSA ever affirmatively told the defendants that entering the CPNWR without permits, driving on a restricted road multiple times and leaving behind large caches of supplies was not illegal. Again, none of the defendants ever personally spoke with anyone with authority who told them that their actions were legal, and none of the defendants were present at the meeting where the line AUSA said the USAO was not interested in prosecuting. The defendants are not entitled to rely on third-hand statements purporting to relay statements made by the government. *See Brebner*, 951 F.2d at 1027. At best, the line AUSA's supposed statement were indicative of prosecutorial priorities, (RT 1/16/19 at 65-66) but they did not indicate that the USAO considered any specific conduct was non-criminal. *See United States v. Ramirez-Valencia*, 202 F.3d 1106, 1109 (9th Cir. 2000) (vague or contradictory statements are not sufficient).

Fourth, the defendants did not reasonably rely on the third-hand statements of the line AUSA, because they all testified that they knew they were violating the regulations and that they knew they could be punished. (RT 1/17/19 at 92-93, 110-11). Accordingly,

---

Specifically, the line AUSA told counsel for No More Deaths in multiple emails that he had "NO authority to bind DOI or DOJ" and that only the United States Attorney had that authority. (CR 70-1 at 25) (emphasis in original).

they were all willing to break the law, they just hoped the consequences would be less severe.

Fifth and finally, the defendants' reliance was not reasonable. Reasonable reliance involves a "relatively common-sense inquiry" into whether "a person sincerely desirous of obeying the law would have accepted the information as true, and would not have been put on notice to make further inquiries." *Lynch*, 903 F.3d at 1077 (internal quotations omitted). All of the defendants admitted that they received this information third hand through other No More Deaths volunteers. (RT 1/16/19 at 160, 181-82; RT 1/17/19 at 23, 40-41, 64, 75-76, 90, 109-10). None of the defendants took any steps to confirm this information directly with the USAO, and at least some of the defendants were aware of past conflicts with the USAO and/or that other people might consider their conduct criminal. (RT 1/16/19 at 160, 181-82; RT 1/17/19 at 23, 40-41, 47, 64-65, 75-78, 90, 109-10).

As discussed above, the defendants were not entitled to rely on statements purportedly made by a line AUSA and relied to them by unnamed members of No More Deaths to avoid criminal liability.

Turning now to the defendants' second proffered basis, they offer language from the hold harmless agreement. Doc. 8 at 29-30. The hold harmless agreement states that the permittee understands that she "may be subject to judicial penalties to include fines, civil action, and/or debarment for failure to remove all personal property or possessions[.]" (Government's Exhibit 2 at Paragraph 13). By its plain language, this could include criminal penalties, and defendants offer no authority to the contrary. In addition, the Ninth Circuit has held that failure to list all of the penalties for a violation of the law is not an "affirmative" statement such that a defendant may rely on it to avoid criminal liability. *Ramirez-Valencia*, 202 F.3d at 1109-10. *United States v. Batterjee*, 361 F.3d 1210 (9th Cir. 2004), cited by the defendants, does not change this result. Doc. 8 at 30. The defendant in *Batterjee* reasonably relied, in part, on an outdated federal certification form to wrongly conclude that he could legally purchase a firearm. 361 F.3d at 1217. That form purported

to list all possible disqualifications, and the hold harmless agreement in this case merely listed possible consequences for violating the rules governing the CPNWR.

In addition, the defendants failed to show that they reasonably relied on the statement in the hold harmless agreement. All of the defendants purposefully chose to not sign the hold harmless agreement, and only Defendant Huse actually read the July 2017 hold harmless agreement. (RT 1/15/19 at 80-81, 128-30; RT 1/16/19 at 168, 175, 178, 187; RT 1/17/19 at 22-23, 27-28, 39, 62, 65-66, 92, 94, 99-100). Defendants Hoffman, Holcomb and Orozco-McCormick relied on other No More Deaths members to tell them what was in it. (RT 1/16/19 at 159; RT 1/17/19 at 22, 62, 94). Given that the defendants purposefully did not sign the hold harmless agreement and most of them never reviewed it, their reliance cannot be reasonable. *See Lynch*, 903 F.3d at 1077.

The defendants should have been aware of information that would make them inquire further as to any alleged agreements between No More Deaths and the government. Instead, they chose to make no inquiries of any government representative, including the staff at the CPNWR visitor center, and to access the CPNWR in purposeful violation of the regulations. Their actions were not those of people truly desirous of obeying the law, but rather of people willing to defy the law to do as they pleased. Accordingly, this Court should find that the defendants failed to meet their burden as to entrapment by estoppel.

### e.  Administrative Procedures Act[8]

#### i.  Legal Standard

Under the Administrative Practices Act (APA), a person who suffers a legal wrong, is adversely affected, or aggrieved due to agency action, within the meaning of a relevant statute, is entitled to judicial review. 5 U.S.C. § 02. Under the APA, the only judicially reviewable agency actions are, first, those actions made reviewable by statute and, second, final agency actions for which there is no other adequate remedy in a court. 5 U.S.C. § 704.

---

[8] The government incorporates by reference its arguments made in its Response to Defendants' Motion to Dismiss Count III Based on Due Process & Renewed Motion to Compel. (CR 99).

Courts cannot review issues if the plaintiff does not identify any discrete agency action. *Friends of the Earth, Bluewater Network Div. v. U.S. Dept. of Interior*, 478 F. Supp. 2d 1, 25 (D.D.C. 2007) (holding that it is a sure sign that a complaint fails the "final agency action" requirement when "it is not at all clear what agency action [plaintiff] purports to challenge.").

## ii.  Discussion

The defendants argue that the CPNWR improperly amended a regulation setting forth the definitions applicable to the regulations governing the CPNWR, 50 C.F.R. § 25.12, and the regulation prohibiting the abandonment of personal property when it added Paragraph 13 to the hold harmless agreement. Doc. 8 at 31-32. Paragraph 13 requires visitors to agree that they will not abandon personal property on the CPNWR in violation of 50 C.F.R. § 27.93 and provides examples of items that constitute personal property. The addition of Paragraph 13 to the hold harmless agreement did not amend either regulation. Accordingly, the addition of Paragraph 13 did not trigger any notice and comment requirements, because it was not a discrete agency action. *See Friends of the Earth*, 478 F. Supp. 2d at 25.

Pursuant to 50 C.F.R. § 25.31, the CPNWR is required to notify the public if it intends to allow a new or to curtail an existing "public access, use or recreational activity." In this case, however, Paragraph 13 did not allow a new or curtail an existing public access, use or recreational activity, because it simply referred to an already existing regulation - 50 C.F.R. § 27.93. That regulation states that "[a]bandoning, discarding, or otherwise leaving any personal property in any national wildlife refuge is prohibited." 50 C.F.R. § 27.93. In providing a list of items following the wording, "including, but not limited to," *see* Doc. 91-2, Paragraph 13 simply provides examples of personal property and does not change the definition of that term as used in 50 C.F.R. § 27.93. "Personal property" means "[a]ny movable or intangible thing that is subject to ownership and not classified as real property." PROPERTY, Black's Law Dictionary (10th ed. 2014). As relevant here, "abandonment" means "To relinquish or give up with the intention of never again

reclaiming one's rights or interest in." ABANDON, Black's Law Dictionary (10th ed. 2014). All of the examples provided in Paragraph 13 and the language describing the requirement to remove personal property from public lands at the end of a visit clearly fall within these definitions, meaning there was no change to any regulation that triggered the notice and comment requirements.

The defendants argue that the government cannot prosecute them for not obtaining the required permits or for abandoning personal property, because Paragraph 13 was invalidly added to the hold harmless agreement. Doc. 8 at 33. Regardless of the defendants' personal beliefs about the lawfulness of Paragraph 13, the addition of that paragraph did not eliminate the requirement that the defendants obtain a permit before entering the refuge, pursuant to 50 C.F.R. § 26.22(b). Nothing about the validity of Paragraph 13 affected the validity of the remaining provisions of the hold harmless agreement, and the defendants offer no authority to the contrary. *See Consul Ltd. v. Solide Enters., Inc.*, 802 F.2d 1143, 1148 (9th Cir. 1986) ("Legal portions of contracts are severable from illegal portions where there is separate legal consideration attributable to the severed portion of the agreement."). Further, the addition of Paragraph 13 to the hold harmless agreement did not change the pre-existing prohibition under 50 C.F.R. § 27.93 to not abandon personal property in the CPNWR.

Finally, it is undisputed that the defendants purposefully failed to sign the hold harmless agreement and obtain the necessary permit to access the CPNWR on the date of their offense because they disagree with the content of Paragraph 13. As such, the defendants cannot demonstrate that, had Paragraph 13 been added only after the procedures they suggest, they would have obtained permits. Accordingly, their rights were not affected by the addition of Paragraph 13 to the hold harmless agreement. As noted by the Supreme Court over 90 years ago, the constitutionality of an act cannot be questioned by a party whose rights are not affected. *See Gorieb v. Fox et al.*, 274 U.S. 603, 606 (1927).

For the reasons discussed above, this Court should find that the defendants failed to meet their burden as to their APA claims and Paragraph 13.

## IV.    Conclusion

For the foregoing reasons, the judgments of conviction and sentences should be affirmed.

Respectfully submitted this 5th day of July, 2019.

MICHAEL BAILEY
United States Attorney
District of Arizona

*/s/ Anna R. Wright & Nathaniel J. Walters*

ANNA WRIGHT &
NATHANIEL J. WALTERS
Assistant U.S. Attorneys

Copy of the foregoing served electronically or by
other means this 5th day of July, 2019, to:

All ECF participants